727 P.2d 1187

Lori QUICK, Nicholas Lee Quick, a minor, and Natalee Quick, a minor, by Lori Quick, their guardian ad litem, Plaintiffs,

v.

James R. CRANE, Johnny L. King, Fred Arthur Turner, Rollins Leasing Corporation, Sigman Meat Company and Does I Through X, Defendants.

James R. CRANE, Defendant-Cross-Claimant, Respondent Cross-Appellant,

v.

Johnny L. KING, Respondent,

and

Fred Arthur Turner, Rollins Leasing Corporation, and Sigman Meat Company, Cross-Defendants, Appellants-Cross-Respondents.

James R. CRANE, Defendant-Cross-Claimant, Third-Party Plaintiff,

v.

Lori QUICK, Personal Representative of the Estate of Rick Quick, Third-Party Defendant.

Johnny L. KING and Jill King, husband and wife, Defendants-Cross-Claimants, Counter-Claimants, Third-Party Plaintiffs-Respondents,

v.

Fred Arthur TURNER, Rollins Leasing Corporation, Sigman Meat Company, Cross-Defendants, Counter-Defendants, Third-Party-Defendants-Appellants,

and

James R. Crane, and Lori Quick, Personal Representative of the Estate of Rick Quick, Cross-Defendants, Counter-Defendants, Third-Party-Defendants.

No. 15701.

Supreme Court of Idaho.

Oct. 17, 1986.

William D. Faler and Curt R. Thomsen of Holden, Kidwell, Hahn & Crapo, Idaho Falls, for cross-defendants, counter-defendants, third-party-defendants-appellants, Turner, et al.

James B. Green, Esq. and Steven V. Richert, Esq., of Green, Service, Gasser & Kerl, Pocatello, for defendant-cross-claimant, respondent-cross-appellant Crane.

John C. Souza of Whittier & Souza, Pocatello, for respondent, King.

DONALDSON, Chief Justice.

This case arises out of an accident that occurred on Interstate 86 near Pocatello, Idaho, in the early morning hours of January 3, 1981. Visibility was poor due to patches of fog. Defendant-appellant, Fred Arthur Turner, was driving a tractor-trailer rig leased by his employer, defendant-appellant, Sigman Meat Company, from defendant-appellant, Rollins Leasing Corporation. According to testimony at trial, Turner had either slowed to around 5 to 10 mph or had completely stopped in the right lane of traffic after he had entered a thick patch of fog. A van owned by respondent, James Crane, collided with the rear of the tractor-trailer rig. A white Nova driven by Penny Caldwell then collided with the van, and a pickup driven by Roger Orme collided with the Nova. Several other vehicles were subsequently involved in this chain reaction of rear-end collisions, but are not involved in this litigation. All the occupants of the van—James Crane, Johnny King and Rick Quick—were injured. Quick subsequently died.

Lori Quick, Rick Quick's widow, then filed a wrongful death action against many of the parties involved in the collision. Numerous cross-claims and counterclaims were asserted, but by the time the case came to trial on June 4, 1984, most of the claims between the parties had been settled. The trial, therefore, was based only on the claims of Crane and King (hereinafter plaintiffs) against Turner, Sigman Meat Company and Rollins Leasing Corporation (defendants). The trial lasted 7 days and resulted in a verdict in favor of Crane and King. A special verdict was returned which provided as follows:

| Party | Percent of Liability |
|---|---|
| Turner, Sigman Meat Co. and Rollins Leasing Corp. | 87% |
| Johnny King | 9% |
| James Crane | 2% |
| Rick Quick | 1% |
| Penny Caldwell | 1% |

The jury verdict awarded Crane $1,000,000 (one million dollars) in damages and King, $100,000 (one hundred thousand dollars) in damages. Each of these awards were subsequently reduced based on each plaintiff's proportion of negligence and settlements they entered into.

After most of the defendants' post-trial motions were denied they filed this appeal and have raised what we have categorized as six separate issues. Crane raises another issue in his cross-appeal. Because each issue is based on different facts, we will elaborate on any additional facts as we address each issue. The issues raised on appeal are:

1. Whether the trial court erred in denying the defendants' motions for judgment n.o.v., for new trial based on the sufficiency of evidence, and for new trial or remittitur based on the alleged excessiveness of damages;

2. Whether the trial court erred in permitting King—who had undergone hypnosis treatment prior to trial—to testify along with two witnesses who had performed the hypnosis;

3. Whether the trial court erred in prohibiting the disclosure of certain settlement agreements to the jury;

4. Whether the trial court erred in preventing the admission of evidence relating to the plaintiff's non-use of seat belts;

5. Whether the trial court erred in refusing to instruct the jury on present value calculations of future lost wages and future medical expenses as well as on the delineation of special and general damages; and

6. Whether comments by counsel for Crane during closing argument violated I.C. § 10–111.

The issue raised in Crane's cross-appeal is:

Whether the trial court erred in its method of crediting certain amounts Crane received in settlements against his total verdict.

I

**Post Trial Motions on Liability and Damages**

Defendants raise several interrelated issues based on the trial court's denial of their motions for judgment n.o.v., a new trial and a remittitur of damages. First, they argue that since the evidence adduced at trial put the rate of speed at which the van was traveling at between 25 mph and 38 mph, the van was necessarily traveling unreasonably fast for the foggy conditions. Therefore, defendants assert, no reasonable jury could have found that the driver and occupants of the van could be only a total of 12% negligent, and the truck driver 87% negligent. Hence, a judgment n.o.v. based on I.R.C.P. 50(b) or a new trial based on I.R.C.P. 59(a)(6) should have been granted.

Second, appellants argue that the damages awarded to Mr. Crane were so excessive that they could only have been the result of passion or prejudice on the part of the jury. Hence, a new trial based on I.R.C.P. 59(a)(5) or a remittitur of damages should have been granted.

In this case, the trial judge heard extensive arguments from counsel but made only a brief statement when he ruled from the bench on all of the defendants' motions. The total extent of the judge's remarks on the motions were:

"I am going to at this time deny the motion for a new trial and the motion for judgment notwithstanding a verdict and motion for remittitur. Its the court's feeling that there is ample evidence before this jury to justify these verdicts."

The complete lack of guidance as to the trial judge's bases for his decision is the main problem we face in this appeal. We will address this problem in turn, but must first set forth and clarify the standards by which a trial judge rules on motions for judgment n.o.v., new trial based on I.R.C.P. 59(a)(5) and (6), and remittitur of damages.

**A. Judgment n.o.v.**

A motion for judgment n.o.v. based on I.R.C.P. 50(b) is treated as simply a delayed motion for a directed verdict and the standard for both is the same. *Yazzie v. Sullivent,* 561 F.2d 183, 188 (10th Cir. 1977). In making the motion, the defendants necessarily admitted the truth of all of the plaintiffs' evidence and every legitimate inference that could be drawn therefrom in the light most favorable to the plaintiff. *Stephens v. Stearns,* 106 Idaho 249, 252–53, 678 P.2d 41, 44–45 (1984). Whether that evidence is sufficient to create an issue of fact is purely a question of law. *Gmeiner v. Yacte,* 100 Idaho 1, 4, 592 P.2d 57, 60 (1979); *Sheets v. Agro-West, Inc.,* 104 Idaho 880, 883, 664 P.2d 787, 788 (Ct.App.1983). The question is not whether there is literally no evidence supporting the party against whom the motion is made, but whether there is substantial evidence upon which the jury could properly find a verdict for that party. *Mann v. Safeway Stores, Inc.,* 95 Idaho 732, 736, 518 P.2d 1194, 1198 (1974). Hence, the trial judge is not free to weigh the evidence or pass on the credibility of witnesses and make his own separate findings of fact and compare them to the jury's findings as he would in deciding on a motion for a new trial. *Gem-*

*einer, supra* 100 Idaho at 4, 592 P.2d at 60. Rather, the trial judge must view all of the evidence and all inferences drawn therefrom in favor of the non-moving party, and decide if there was substantial evidence to justify submitting the case to the jury, or, in other words, that there can be but one conclusion as to the verdict that reasonable minds could have reached. *Stephens, supra* 106 Idaho at 253, 678 P.2d at 45; *Brand S Corp. v. King,* 102 Idaho 731, 733, 639 P.2d 429, 431 (1981). Thus, the function of I.R.C.P. 50(b) is to give the trial court the last opportunity to order the judgment that the law requires.

In determining whether a directed verdict or judgment n.o.v. should have been granted, the appellate court applies the same standard as does the trial court which passed on the motion originally. *Gmeiner, supra* 100 Idaho at 4, 592 P.2d at 60. Whether a verdict should be directed, as noted above, is purely a question of law and on those questions, the parties are entitled to full review by the appellate court without special deference to the views of the trial court.[1] Wright & Miller, 9 Federal Practice & Procedure § 2536 at 595 (1971 & Supp.1985); *Carey v. Jackson,* 603 P.2d 868, 877 (Wyo.1979).

Hence, this Court must review the record of the trial below and draw all inferences from the evidence in a light most favorable to the non-moving party to determine if there was substantial evidence to justify submitting the case to the jury. Based upon our review of the record on this standard, we conclude that there was substantial evidence to justify submitting the case to the jury.

There was evidence adduced at trial that the reasonably safe rate of speed to travel in the foggy conditions that apparently existed at the time of the accident was between 5 and 10 mph. Defendants argue that since the van was going at least 25 mph and perhaps more, reasonable minds would have to conclude that the driver of

the van was acting more negligently than the truck driver and, therefore, the truck driver's negligence could not, as a matter of law, be the primary cause of the accident. Hence, defendants contend a judgment n.o.v. should have been granted regardless of whether the truck was stopped or going very slowly.

We strongly disagree and note that defendants' argument was based on only one interpretation of the evidence which indicated 5 to 10 mph would be a safe speed in which to travel in the fog. Furthermore, it ignores other important evidence which was also adduced at trial; and it mischaracterizes the jury's function in finding the facts of this case.

The main testimony on which defendants base their argument came from police and medical personnel who arrived at the scene of the accident shortly after it occurred. They entered the fog knowing that several vehicles were stopped in the middle of the highway, and so they proceeded with great caution. The driver of the van, and the driver of the other vehicles which followed behind it, had no idea a vehicle might be stopped in the middle of the highway and had no reason to expect one to be. A stopped vehicle in the middle of the traveling lane of a highway, even when conditions impair visibility, is a hazard the law does not require other drivers to assume. In fact, a driver has the right to assume other drivers are exercising reasonable care on the highways by obeying the rules of the road. *Dryer v. Zero Refrigeration Line, Inc.,* 92 Idaho 83, 86, 437 P.2d 355, 358 (1968).

The fact that the fog at the site of the accident was thick, was generally undisputed. However, how suddenly the fog became so thick and how long the van traveled through the fog was disputed. John King described the fog as being light and wispy at first, and said the visibility just prior to entering the fog bank was

---

**1.** This is in marked contrast to the standard of appellate review for a new trial which is dis-  cussed below.

clear enough to see over to the right-of-way fence. Then, the fog suddenly got thick, and in a very short time the van came upon the truck. Roger Orme, who drove the truck which collided with the white Nova, also described the fog as he came through it as just whisps at first which would clear away. At this time he was traveling approximately 40 mph. Then, all of a sudden, he hit a dense fog cloud that did not disappear and he began to slow down, but came upon the truck, van and Nova very soon.

It is the very nature of the jury process for jurors to bring with them into the jury room their general life experiences, and a sense of what is and is not reasonable behavior in the context of the facts before them. In fact, Instruction No. 8 specifically told the jury that "negligence may thus consist of the failure to do something which a reasonably careful person would do or the doing of something which a reasonably careful person would not do, under the circumstances similar to those shown by the evidence. *The law does not say how a reasonably careful person would act under those circumstances. That is for you to decide.*" (Emphasis added).

The jurors were all from the Pocatello area and would have been familiar with what fog conditions in the area could be like. No doubt they also had driven through fog of all densities, and knew how suddenly visibility can be impaired when light fog suddenly becomes dense. They each knew what a reasonable speed would be under the conditions and, most importantly in the context of this case, how quickly a driver should slow down when he suddenly enters thick fog. If a driver slows down too quickly, he creates a hazard for vehicles following behind him; and yet, if he slows down too slowly, he risks colliding with vehicles in front of him.

Another factor which was raised by the evidence at trial was the presence of an advisory speed limit sign located a few miles before the site of the accident. It warned drivers to slow to 35 mph. Although the jury was instructed that this advisory speed limit does not have the mandatory force of law, the evidence was, nonetheless, introduced and the jurors were free to consider its implication as it bore on their evaluation of what a reasonable speed would have been.

The jury was also instructed as to the existence of several statutes which govern motorists traveling on roads in this state. Instruction No. 21 explained that no person shall drive at a speed greater than is reasonable under the conditions, and at a safe and appropriate speed when special hazards exist by reason of weather. As noted above, this statute, among other things, would prohibit slowing down too quickly or coming to a stop when entering a fog bank. There was evidence from which the jury could have concluded that Turner did, in fact, panic and slow down too quickly and/or come to a complete stop when he entered the fog, hence violating a statute.

Instructions Nos. 22 and 23 explained that no person shall drive at such a slow speed as to impede the reasonable movement of traffic, except when reduced speed is necessary for safe operation. Instruction No. 24 explained that no person shall stop, park or leave standing any vehicle on the roadway when it is practicable to stop, park or leave the vehicle off the roadway. There was evidence that there was at least nine feet of pavement to the right of the lane in which the truck was traveling where Turner could have pulled the truck over if he felt that he could not continue to drive safely in the fog. There was also evidence that if Turner had simply just begun to pull off the roadway by approximately three feet, the van would have been able to successfully swerve away from the truck and avoid the collision. In addition, there was evidence that the truck did not have any flashing or hazard lights on at the time of the collision. Hence, any warning to oncoming vehicles behind the truck would have been substantially diminished.

The instructions given to the jury and the evidence presented to them did not mandate a finding that the only safe speed in which to enter the fog bank was be-

tween 5 and 10 mph. The jury had to decide the reasonableness of the speed at which both the van and the truck were traveling in light of a wide variety of evidentiary factors. The jury's conclusion was that neither vehicle was being driven in a totally safe manner given the conditions. However, it determined that the truck driver's conduct was substantially more negligent, and that said negligence was the proximate cause of the accident. These conclusions are supported by the evidence when viewed in a light most favorable to the plaintiffs. Based on our review of that evidence, we cannot agree with the defendants' that reasonable minds could only have concluded that the van driver had to have been more negligent than the truck driver. The district judge did not err when he denied the defendants' motion for a judgment n.o.v.

### B.

### New Trial and Remittitur of Damages

The defendants made motions for a new trial based on two distinct grounds under I.R.C.P. 59(a). The first is grounded on the insufficiency of the evidence to justify the verdict. I.R.C.P. 59(a)(6). The second is grounded on the excessiveness of the damage award. I.R.C.P. 59(a)(5). In conjunction with this latter ground, defendants also moved, in the alternative, for a remittitur of damages. We will address each of these grounds separately before addressing what we see as the basic problem of applying our standard of review in a meaningful way to the record in this case.

### 1. I.R.C.P. 59(a)(6)—Sufficiency of Evidence.

Idaho Rule of Civil Procedure 59(a)(6) permits the trial court to grant a new trial on all or part of the issues in an action by reason of the "[i]nsufficiency of the evidence to justify the verdict or other decision, or that it is against the law." It is well established that the trial judge may grant a new trial based on I.R.C.P. Rule 59(a)(6) where, after he has weighed all the evidence, including his own determination

of the credibility of the witnesses, he concludes that the verdict is not in accord with his assessment of the clear weight of the evidence. *Sheets v. Agro-West, Inc.*, 104 Idaho 880, 883, 664 P.2d 787, 790 (Ct.App. 1983).

As was done in this case, a motion for a judgment n.o.v. may be joined in the alternative with a motion for a new trial in conformance with the requirements of Rule 59(a). I.R.C.P. 50(b). However, the two motions have wholly distinct functions and different standards govern their allowance. Wright & Miller, *supra* § 2531 at 571. Unfortunately, some courts have confused the two standards and have persisted in stating as the standard for judgment n.o.v. the much more lenient test that is applicable to a motion for a new trial on the ground that the verdict is against the weight of, or is not justified by, the evidence. *Id.* Because of the finality of a judgment n.o.v.— *i.e.*, the parties are not given the opportunity to try the case again—it is measured by a far more rigorous standard than is a motion for a new trial.

On a motion for a new trial, the court has broad discretion. On a motion for directed verdict or judgment n.o.v., it has no discretion and must consider only the question of law whether there is sufficient evidence to raise a jury issue. *Id.* On a motion for a new trial the court weighs the evidence and the credibility of the witnesses. On a motion for a directed verdict or for judgment n.o.v., it does not. *Id.*

In the case of *Reid v. Maryland Cas. Co.*, 63 F.2d 10 (5th Cir.1933), the Fifth Circuit wrote what has become the definitive statement on a federal trial judge's role with respect to those two oft-confused motions. This statement is just as definitive for the trial judges in the state courts of Idaho.

> "A district judge in the conduct of a common law trial in the Federal court has two separate and distinct functions, each equally vital to the just conduct of such trial, each separate and distinct

from the other. One, his function before verdict, is to determine whether there is any evidence to carry the case, or any issue in it, to the jury. This function requires him to submit every disputed issue to them. That is, every issue in regard to which reasonable minds might draw different conclusions, and to refuse to submit to them issues on which there is no evidence, that is, issues as to result of which reasonable minds cannot disagree. The other, his function after verdict, is to refuse in the exercise of his discretion, to permit a verdict to stand which, though supported by evidence, is in his opinion against the right and justice of the case." *Id.* at 12.

Unfortunately, the cryptic comment of the trial judge in the present case suggests that he either confused his function in ruling on these two distinct motions, or if he did appreciate their differences, he completely failed to so articulate. Yet, it is essential that if an alternative motion for a new trial is made with the motion for judgment n.o.v., the trial court must rule on both motions separately.

Thus, on a motion for a new trial under this rule, unlike a motion for a directed verdict or judgment n.o.v., the trial judge may set aside the verdict even though there is substantial evidence to support it. *See* Wright & Miller, 11 Federal Practice and Procedure § 2806, at 43 (1973 & Supp.1985). As the Idaho Court of Appeals stated in *Sheets,*

"We conclude that the 'substantial evidence' standard is not appropriate for new trial motions. To adopt such a standard would, in effect, eliminate new trial motions, and leave a trial court with a choice between granting a judgment n.o.v. or acquiescing in what the court believes to be a flawed verdict. We do not believe that a trial court should be limited in this fashion." *Sheets, supra* 104 Idaho at 884, 664 P.2d at 791.

The trial judge is not required to view the evidence in a light most favorable to the verdict-winner. Although the mere fact that the evidence is in conflict is not enough to set aside the verdict and grant a new trial, when a motion for a new trial is based on the ground that the verdict is against the weight of the evidence, the judge is free to weigh the conflicting evidence for himself. In fact, as Wright & Miller note in their treatise discussing the similar Federal Rule of Civil Procedure 59, "the granting of a new trial on the ground that the verdict is against the weight of the evidence 'involves an element of discretion which goes further than the mere sufficiency of the evidence. It embraces all the reasons which inhere in the integrity of the jury system itself.' " Wright & Miller, *supra* § 2806, at 45 (*citing Tidewater Oil Co. v. Waller,* 302 F.2d 638 (10th Cir.1962)).

There is no adequate verbal formula that will be of much use to the trial courts as they decide on motions for new trials. Necessarily, their function involves considerable discretion because of the unique position they have to hear all the testimony and examine all the evidence. Perhaps the best characterization of the trial court's role in passing on new trial motions under I.R.C.P. 59(a)(6) was stated in *Blaine v. Byers,* 91 Idaho 665, 429 P.2d 397 (1967) where we said,

"[t]he trial court may grant a new trial when it is satisfied the verdict is not supported by, or is contrary to, the evidence, or is convinced the verdict is not in accord with the clear weight of the evidence and that the ends of justice would be subserved by vacating it, or when the verdict is not in accord with either law or justice." *Id.* at 671, 429 P.2d at 403; *Tibbs v. City of Sandpoint,* 100 Idaho 667, 669, 603 P.2d 1001, 1003 (1979).

The trial judge is sitting at the heart of our trial process, a position we on the appellate level cannot duplicate. On the one hand, he does not sit to approve miscarriages of justice when they occur in his courtroom. His authority to set aside the verdict on a new trial motion is supported by clear precedent at common law. Indeed,

far from being a denegration or usurpation of the right to a trial by jury, trial judges have always been regarded as an integral part of that right. Wright & Miller, *supra* § 2806, at 49. On the other hand, respect for the collective wisdom of the jury and the function entrusted to it under our constitution suggests the trial judge should, in most cases, accept the jury's findings even though he may have doubts about some of their conclusions. *Id.* Certainly, all that can be expected of our trial judges as they exercise their discretion in this area is that they balance these conflicting principles in light of the particular facts of each case. *Id.* "If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial." *Id.; U.S. v. U.S. Gypsum Co.*, 333 U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948).

## 2. I.R.C.P. 59(a)(5) Excessive or Inadequate Damages.

The second basis upon which the defendants made their motion for a new trial or, in the alternative, a remittitur of damages was that the damage award to Crane was excessive and, therefore, could only have been the result of passion or prejudice. I.R.C.P. 59(a)(5). The jury awarded Crane $1 million, which the trial court subsequently reduced to just over $850,000 based on the percentage of Crane's liability found by the jury, and that amount Crane received in settlements with Johnny King, Penny Caldwell, Roger Orme and Rick Quick's estate. Defendants assert that Crane has made a good recovery from the accident and has few residual injuries. They argue that Crane's mild permanent impairment, taken together with the actual medical costs of rehabilitation, could not have justified a $1 million verdict.

In ruling upon a motion for a new trial premised upon inadequate or excessive damages, the rule the trial court must follow is set forth in *Dinneen v. Finch*, 100 Idaho 620, 603 P.2d 575 (1979):

"Where a motion for a new trial is premised on inadequate or excessive damages, the trial court *must* weigh the evidence and then compare the jury's award to what he would have given had there been no jury. If the disparity is so great that it appears to the trial court that the award was given under the influence of passion or prejudice, the verdict ought not stand. It need not be proven that there was in fact passion or prejudice nor is it necessary to point to such in the record. The appearance of such is sufficient. A trial court is not restricted to ruling a verdict inadequate or excessive 'as a matter of law.' *Blaine v. Byers, supra.* Additionally, the rule that a verdict will not be set aside when supported by substantial but conflicting evidence has no application to trial court ruling upon a motion for a new trial. *Blaine, supra; Rosenburg v. Toetley*, 93 Idaho 135, 456 P.2d 779 (1969)." *Id.* at 625–26, 603 P.2d at 580–81.

There is a qualitative difference between a trial judge's role in deciding whether a new trial is justified based on the insufficiency of the evidence under Rule 59(a)(6), and whether a new trial is justified based on the amount of the jury's award of damages under Rule 59(a)(5). We have grappled with the two standards under these two separate rules in previous cases but have not effectively distinguished them, as we endeavor to do so in this case. *See e.g., Mendenhall v. MacGregor Triangle Co.*, 83 Idaho 145, 358 P.2d 860 (1960); *Blaine v. Byers*, 91 Idaho 665, 429 P.2d 397 (1967); *Dawson v. Olson*, 95 Idaho 295, 507 P.2d 804 (1973); *Dinneen, supra; Cheney v. Palos Verdes Investment Corp.*, 104 Idaho 897, 665 P.2d 661 (1983). As to the standard under Rule 59(a)(5), this Court stated in *Dinneen,*

"Trial courts, unlike jurors, have the advantage of having heard *and determined* many hundreds of damage claims. A trial court in a jury trial hears exactly the same evidence as the jury hears, and makes his own inward assessment of credibility and weight. So, when after a trial the jury returns a verdict which is

thereafter assailed, either as excessive or as inadequate, the trial court's judgment is then called into play, requiring of him a *weighing* of evidence. The sole question on a Rule 59(a)(5) motion is the amount of the jury's damage award, as compared to the amount of damages the trial court in his view of the evidence would have awarded." *Dinneen, supra* at 624–25, 603 P.2d at 579–80.

Trial judge and attorneys, unlike jurors, have experience dealing with the seemingly impossible task of assigning a monetary figure to such unquantifiable damage concepts as physical and emotional pain, suffering, trauma, and distress, as well as relational damages such as impairments to one's marriage or family relationships. For example, how much should someone receive in money damages for having to go through life without the sense of smell as Jim Crane will in this case? One dollar a day? Or one thousand dollars a day? From a layman's perspective, it borders on the absurd to think that we can even presume to place a monetary value on such things. Yet, the legal process cannot permit tortfeasors to be free of the full legal consequences of their tortious acts and *must* provide some means of compensation under our tort system.

At trial, the jury is exposed to evidence of the plaintiff's impairments and sufferings. Witnesses such as doctors, family, friends and the plaintiff himself testify to that effect. However, with the exception of special damages which have a specific monetary amount associated with them, the jury is not then given evidence on the monetary amount that would be necessary to compensate the plaintiff for his impairment and sufferings; *i.e.,* his general damages. That comes only in the arguments of plaintiff's counsel to the jury. Defendants' counsel, to protect himself in case he loses on the issue of liability, will dispute the plaintiff's numbers and/or come up with monetary figures of his own. Where do these numbers come from? Generally, they are based on what counsel feels they can reasonably justify without damaging their credibility or the credibility of their client in front of the jury. The numbers come from counsel's own experience in dealing with similar injuries in previous cases, and their skill as lawyers to quantify these damages in the best way they can for their client.

It is unlikely that the jurors have ever had to apply specific monetary figures to such seemingly unquantifiable concepts as pain and suffering. Unlike their deliberations on liability, the jury cannot draw on their own past experiences of reasonable behavior. Instead, we expect them to draw upon their sense of fairness and justice to come up with an appropriate figure.

When the trial judge goes through the same evaluative process of assigning a damage award to the parties upon a motion for a new trial under I.R.C.P. 59(a)(5), he draws upon his experiences with previous cases involving general damages and comes up with a figure he believes is fair and just. Obviously, he has a much better idea of what the scope and limitations on such damages may be. His figure of damages will often be different from that of the jury's. *But,* since it is a jury function to set the damage award based on its sense of fairness and justice, the trial judge must defer to the jury, *unless* it is apparent to the trial judge that there is a great disparity between the two damage awards and that disparity cannot be explained away as simply the product of two separate entities valuing the proof of the plaintiff's injuries in two equally fair ways.

In other words, if the trial judge discovers that his determination of damages is so substantially different from that of the jury that he can *only* explain this difference as resulting from some unfair behavior, or what the law calls "passion or prejudice," on the part of the jury against one or some of the parties, then he should grant a new trial. How substantial this difference must be is impossible to formulate with any degree of accuracy. It will necessarily vary with the factual context of each case and the trial judge's sense of fairness and justice. Frequent character-

izations have included the idea that the disparity must "shock the conscience" of the trial judge or lead him to conclude that it would be "unconscionable" to let the damage award stand as the jury set it. *Gibson v. Western Fire Ins. Co.*, 682 P.2d 725 (Mont.1984); *Mammo v. State*, 138 Ariz. 528, 675 P.2d 1347 (1983). These characterizations, of course, do little more than restate the trial judge's discretionary perspective but are, nonetheless, frequently employed in other areas of the law and, therefore, may be useful to the trial judge.

■ It should be emphasized again that the rule that a verdict will not be set aside when it is supported by substantial but conflicting evidence has *no application* to a trial court ruling upon a motion for a new trial. *Dinneen, supra,* 100 Idaho at 626, 603 P.2d at 581; *Blaine, supra* at 669, 429 P.2d at 402; *Rosenberg v. Toetly*, 93 Idaho 135, 456 P.2d 779 (1969). As noted in the previous section, this substantial evidence standard is applicable to a trial court's determination on a motion for judgment n.o.v.

### 3. Remittitur of Damages.

There is a practice, long sanctioned by the courts of this state, and other states, whereby the trial court may condition the denial of a motion for a new trial upon the filing by the plaintiff of a remittitur of the jury's damage award by a stated amount. The plaintiff is given the choice of either submitting to a new trial or of accepting the damage amount that the trial court considers justified. Wright & Miller, *supra* § 2815, at 100.

■ Of course, the trial court cannot simply grant a remittitur without ruling on the motion for a new trial based on the excessiveness of damages under I.R.C.P. 59(a)(5).[2] The trial judge must first have determined that the jury's damage award was so excessive that it could only have been a product of passion or prejudice on the part of the jury. A motion for a remittitur of damages is purely an alternative to

this basis for a new trial. Hence, the amount by which the trial judge offers to reduce the damage award is a discretionary decision that is inexorably linked to the exercise of discretion in ruling on a new trial motion under I.R.C.P. 59(a)(5).

One limitation on the use of remittiturs that has been recognized in other jurisdictions is that they are not proper if the verdict was the result of passion or prejudice to such an extent that such passion or prejudice may have infected the jury's decision on liability as well as damages. *Id.* at 103; *see also Minneapolis, St. P. & S.S. M.R. Co. v. Moquin*, 283 U.S. 520, 51 S.Ct. 501, 75 L.Ed. 1243 (1931); *Morgan v. DiBiase*, 121 R.I. 826, 403 A.2d 1080, 1083 (1979). We recognize that this limitation is valid and should be an inherent part of the trial court's exercise of discretion in ruling on motions for a new trial.

### 4. Appellate Review.

In reviewing the denial of a motion for a new trial our standard is well settled. This Court has been consistent in recognizing the trial court's important function in passing on motions for new trial and upholding the trial court's grant or denial of such motions unless the court has *manifestly* abused the wide discretion vested in it. *Tibbs v. City of Sandpoint*, 100 Idaho 667, 669, 603 P.2d 1001, 1003 (1979); *Seppi v. Betty*, 99 Idaho 186, 189, 579 P.2d 683, 686 (1978). The trial court is in a far better position to weigh the demeanor, credibility, and testimony of witnesses, and the persuasiveness of all the evidence. Appellate review is necessarily more limited. While we must review the evidence, we are not in a position to "weigh" it as the trial court can. *Dinneen, supra* at 626, 603 P.2d at 581.

In *Luther v. Howland*, 101 Idaho 373, 613 P.2d 666 (1980), this Court stated that the trial court need not specify its reasons for granting a new trial, although it is

---

**2.** It is obvious that since a remittitur of damages arises only out of a new trial motion based on the excessiveness of damages under I.R.C.P.

59(a)(5), a remittitur cannot be based on any of the other grounds for a new trial enumerated under I.R.C.P. 59(a).

encouraged to do so. All we required was that the trial court set down the statutory grounds for its order. *Id.* at 375, 613 P.2d at 668; *see also, Tibbs, supra,* 100 Idaho at 669, 603 P.2d at 1003; *Smith v. Great Basin Grain Co.,* 98 Idaho 266, 275, 561 P.2d 1299, 1307 (1977). We also stated in those cases that the trial court is vested with broad, although not absolute, discretion in granting a new trial, and its determination will not be overturned absent an abuse of discretion. *Luther, supra,* 101 Idaho at 375, 613 P.2d at 668; *Tibbs, supra* 100 Idaho at 669, 603 P.2d at 1003; *Smith, supra* 98 Idaho at 275, 561 P.2d at 1307.

The question that now arises, in the context of this case particularly, is how we can truly say that the trial court has not abused its discretion when we do not know the reasons for its ruling on the new trial motions? How can we state that the trial judge correctly applied the standard for each new trial motion when all he tells us is that he grants or denies them based on this rule or that rule? As noted above, the trial court's standard for different grounds enumerated in I.R.C.P. 59(a) varies considerably.

In this case, when the judge denied the defendant's motion for a new trial and remittitur along with the motion for judgment n.o.v., he simply stated, "It is the court's feeling that there is ample evidence before this jury to justify these verdicts." Clearly, this does not reveal whether the trial judge appreciated the difference between a judgment n.o.v. and a new trial based on I.R.C.P. 59(a)(6), nor does it indicate whether he applied the correct standard for either. Furthermore, since the trial court made no reference to either I.R.C.P. 59(a)(5) or the language contained in that rule, it is impossible for this Court to determine whether the trial court even ruled on that part of the defendants' motion, let alone whether he applied the correct standard for that rule.

The holding in *Luther* that this Court should not require the trial court to make his reasons apparent when ruling on a motion for a new trial seemed adequate for the facts of that case, and we were faced with no compelling reason to impose a more strict requirement at that time. We did, however, fully recognize that a statement of the trial court's reasons is extremely helpful in reviewing his exercise of discretion on appeal, and we "encouraged" the trial court to make such a statement. Unfortunately, the weaknesses of this passive approach in *Luther* have become painfully apparent in several cases since then, particularly the case at bar. The most compelling argument for toughening the *Luther* "abuse of discretion" standard of appellate review came from the Court of Appeals' case of *Sheets.* There, the Court, in the majority opinion, noted,

"We believe that an appropriate review of an exercise of discretion, whether concerning new trial motions or other motions in which a court may exercise discretion, requires that we review the circumstances of the case and the grounds upon which the trial court based its decision, to ascertain that the trial court did not abuse its discretion. To facilitate a meaningful review of the court's exercise of discretion on a new trial motion, the court should state on the record the reasons which it believes support a new trial, as well as the grounds, provided by rule or statute, on which the court bases its order for a new trial. *See* Rosenberg, *Judicial Discretion of the Trial Court, Viewed From Above,* 22 Syracuse L.Rev. 635 (1971). However, our Supreme Court has adhered to the position that, where the trial court grants a new trial, failure to state why the court felt the evidence was insufficient to support the verdict does not constitute reversible error. *Luther v. Howland,* 101 Idaho 373, 375, 613 P.2d 666, 668 (1980). We are constrained to abide by this view." *Sheets, supra* 104 Idaho at 884, 664 P.2d at 791.

The Court of Appeals then went on to discuss through a unanimous concurring opinion the rationale for requiring a more substantive record of the trial court's disposition of new trial motions.

As the Court of Appeals noted, judicial discretion "requires an actual exercise of judgment and a consideration of the facts and circumstances which are necessary to make a sound, fair, and just determination, and a knowledge of the facts upon which the discretion may properly operate." *Id.* at 887, 664 P.2d at 794. This is consistent with what we stated in *Lisher v. Krasselt,* 96 Idaho 854, 538 P.2d 783 (1975):

"We decline to ascribe a definitive meaning to the amorphous phrase 'abuse of discretion' solely for the purpose of this case, but it will suffice to say, that where the trial court has exercised such discretion after a careful consideration of the relevant factual circumstances and principles of law, and without arbitrary disregard for those facts and principles of justice, we do not disturb that action." *Id.* at 857, 538 P.2d at 786 (footnotes omitted); *see also Tibbs, supra* 100 Idaho at 669, 603 P.2d at 1003.

Thus, an exercise of discretion by a judge which violates these restraints by disregarding relevant factual considerations or principles of law and justice is an abuse of discretion.

Logically, then, for an appellate court to determine whether discretion has been abused, it must be able to ascertain whether the trial judge has actually given due consideration to the facts and circumstances of the case, and correctly applied the law thereto. *Sheets, supra* 104 Idaho at 887–88, 664 P.2d at 794–95; *Lisher, supra* 96 Idaho at 857, 538 P.2d at 786.

We have long held that the appellate court should not substitute its discretion for that of the trial court. Implicit in this principle is the truism that the appellate court should not simply focus upon the results of a discretionary decision below, but rather upon the process by which the trial court reached its discretionary decision. A perpetuation of our *Luther* standard of review does little more than tie our own hands in too many cases, and leads to what can only be described as result-oriented appellate decisions. Our brethren on the Court of Appeals were quite right when they stated that,

"An appellate court should not focus primarily upon the outcome of a discretionary decision below, but upon the process by which the trial judge reached his decision. *In order for the appellate court to perform this function properly, it must be informed of the reasons for the court's decision. Unless those reasons are obvious from the record itself, they must be stated by the trial judge.* Where the reasons are neither obvious nor stated, the appellate court is left to speculate about the trial court's perception of the law and knowledge of the facts. As a practical matter, the appellate court finds itself locked into a result-oriented review." *Sheets, supra* 104 Idaho at 888, 664 P.2d at 795. (Our emphasis.)

█ As in *Soria v. Sierra Pacific Airlines, Inc.,* 111 Idaho 594, 726 P.2d 706 (1986); we therefore hold that the trial judge must disclose his reasoning for granting or denying motions for a new trial and/or remittitur or additur unless those reasons are obvious from the record itself. Such motions involve what the Court of Appeals has aptly characterized as the exercise of "adjudicative discretion"—discretion which determines or directly affects the outcome of litigation and, therefore, has a substantial impact on the litigants.[3]

It might be argued that requiring judges to state their reasons imposes an undue hardship on the time of an already busy trial court. However, as the Court of Appeals noted,

"Where proceedings at trial clearly have gone awry, the reasons for granting a new trial can be readily identified and stated. In cases where the proceedings

---

**3.** Most discretionary acts of the trial court are not so clearly outcome determinative, but rather deal more directly with the management of the litigation. Examples of management discretion include the calendaring of cases, supervision of voir dire examinations of jurors, setting limits on cross-examination and rebuttal testimony, etc. *Sheets, supra* 104 Idaho at 888, 664 P.2d at 795.

outwardly seem regular, but the judge nevertheless feels that an injustice has been done, it may be more difficult to identify and to state the reasons. However, these hard cases are precisely the cases where the discipline of stating reasons is most needed." *Sheets, supra* 104 Idaho at 889, 664 P.2d at 796.

Similarly, we cannot agree that a trial judge will always be able to find some reason to justify his decision and, hence, a statement of reasons would serve little purpose. On the appellate level, we have seldom seen anything but honest and conscientious judges who do not rationalize their actions with sham reasoning. Indeed, "The rare judge who is disposed to act arbitrarily will better be restrained by requirement that he state reasons for his actions than by the present practice of condoning failure to state any reasons at all." *Id.*

I.R.C.P. 59(a) enumerates several grounds upon which a new trial can be sought and granted. A moving party must identify those grounds upon which he relies. We have held that the trial judge must also indicate the grounds upon which he relies when he grants a new trial. *See Tibbs, supra* 100 Idaho at 669, 603 P.2d at 1003. As noted above, in previous case law we have "encouraged" the trial judges to go beyond a mere recital of the grounds and state their reasoning behind their grant of a new trial or, in a denial, why the movant has failed to establish a new trial should have been granted under each of the grounds he claims. This case before us today illustrates that such encouragement is clearly not enough.

We have consistently deferred to the sound discretion of the trial judge as he weighs the evidence and determines whether a new trial should be granted, and we will continue to do so. However, if we are to preserve the exercise of sound judicial discretion at the trial court level, and if we are to avoid result-oriented appellate review of such discretion, we must now take the next logical step, toward which much of our previous case law on the issue has led, and require the trial court to state its par-

ticular reasons for granting or denying motions for a new trial and/or alternative remittiturs or additurs.

■ Of necessity, when the trial court *grants* one of these motions, it should state its reasons with particularity unless it is obvious from the record itself. Whereas, if the trial court simply *denies* the motion, it need only state, or point to where in the record it reveals, that the moving party has failed to meet its burden to justify granting the motion. We see no logic in requiring the trial court to explain a grant but not a denial of such motions, although the extent of his explanation will obviously be greater with a grant. In either case, he must distinguish between the various motions and the grounds upon which they are based, and not, as was the case here, simply lump them all together and issue a general grant or denial.

■ Since it is not obvious from the record why the defendants' motions for a new trial and remittitur should be summarily denied, we must remand this case to the district judge who heard the case to state his reasons for his denial of each of defendants' separate motions, consistent with this opinion.

II

### Hypnosis & *Iwakiri* Rule

■ Following the accident, Johnny King was deposed on December 22, 1981. In January of 1982, he underwent a psychological examination which included hypnosis sessions by Dr. Martin Brooks, a psychologist in Pocatello. King then submitted to a second deposition on March 30, 1982. Subsequent to that deposition, King met with Gail Anderson, a counselor at Idaho State University trained in hypnosis, and underwent further hypnotic sessions.

On May 14, 1984, a hearing was held on defendant's motion in limine to determine the admissibility of Johnny King's testimony at trial in light of his prior hypnotic therapy, as well as the admissibility of the testimony of Dr. Brooks and Gail

Anderson. This hearing was held a week after the decision in *State v. Iwakiri*, 106 Idaho 618, 682 P.2d 571 (1984) was issued by this Court.

*Iwakiri* is the definitive Idaho case on the use of testimony of a witness who has been hypnotized. *See also, State v. Joblin*, 107 Idaho 351, 689 P.2d 767 (1984); *State v. Bainbridge*, 108 Idaho 273, 698 P.2d 335 (1985). In *Iwakiri*, we adopted a rule directing the trial courts to conduct pretrial hearings on the procedures used during the hypnotic session in which the witness in question was involved. We stated that

> "[t]rial judges should then apply a 'totality of circumstances' test and make a determination whether, in view of all the circumstances, the proposed testimony is sufficiently reliable to merit admission. If the witness's memory seems to have been altered in such a way as to render it unreliable, the court may rule the witness to be incompetent." *Iwakiri, supra* 106 Idaho at 625, 682 P.2d at 578.

We then set forth several safeguards [4] to help the trial court as it assessed all the circumstances surrounding the proposed testimony and determined the witness's competency to testify in whole or in part. We emphasized that these safeguards were necessary for the guidance of the trial court, but did not operate as a *per se* rule of admissibility. *Id.* at 624, 682 P.2d at 577. We foresaw that there would be occasions when these safeguards were not entirely followed but, nevertheless, the trial court could conclude that the testimony

would still be sufficiently reliable for its admission. *Id.* at 624–25, 682 P.2d at 577–78.

The rule set out in *Iwakiri* was one of competency of witnesses and not of exclusion and it brought the issue of hypnosis in line with other evidentiary problems of a similar nature. *Id.* at 625, 682 P.2d at 578. In fact, we illustrated how hypnosis was not the only event which could result in the modification of a witness's memory or otherwise render it untrustworthy. *Id.* at 625–26, 682 P.2d at 578–79.

> "An idle conversation with another witness to the same occurrence can, according to some experts, lead to a modification of a witness's memory. While the possibility of alteration of memory through the use of hypnosis is much greater than other subsequent events, the question is only one of degree." *Id.* at 626, 682 P.2d at 579.

Since this is a question of degree in which the totality of circumstances must be considered, we gave control over this question to the entity most experienced in dealing with such evidentiary questions, the trial court. *Id.* Therefore, in the case at bar, we must review the record of the district court's proceedings on the issue of hypnosis and determine whether it correctly applied the principles laid down in the *Iwakiri* case. Then, if we determine that the trial court erred in its ruling on the witness's competency to testify, since this

---

**4.** Those safeguards as enumerated in *Iwakiri* are:

"(1) The hypnotic session should be conducted by a licensed psychiatrist or psychologist trained in the use of hypnosis and thus aware of its possible effects on memory, so as to aid in the prevention of cueing and improper suggestion.

"(2) The person conducting the session should be independent from either of the parties in the case.

"(3) Information given to the hypnotist by either party concerning the case should be noted, preferably in written form, so that the extent of information the subject received from the hypnotist may be determined.

"(4) Before hypnosis, the hypnotist should obtain a detailed description of the facts from the subject, avoiding adding new elements to the subject's description.

"(5) The session should be recorded so a permanent record is available to ensure against suggestive procedures. Videotape is a preferable method of recordation, but not mandatory.

"(6) Preferably, only the hypnotist and subject should be present during any phase of the hypnotic session, but other persons should be allowed to attend if their attendance can be shown to be essential and steps are taken to prevent their influencing the results of the session, (*i.e.*, they are not allowed to participate in the session, etc.)." *Id.* 106 Idaho at 625, 682 P.2d at 578.

is a civil case, we must determine whether such ruling constituted reversible error.

As noted above, the trial court did hold a hearing on the issue of Johnny King's prior hypnosis. At this hearing the parties argued the application of the *Iwakiri* standards to King's hypnosis sessions. At the time, counsel for King hedged his bet by reserving the right to object to the hearing as not being the "full-blown evidentiary hearing" he said was contemplated by *Iwakiri.* Counsel for the defendants made no similar objection at the time, but simply agreed to submit to another hearing at a later date if the trial court so required. Now, on appeal from the adverse verdict, the defendants complain that since the trial court did not hear testimony or review the depositions presented by the parties, the pretrial hearing did not constitute an *Iwakiri* hearing.

When the hearing was scheduled, it was obviously not intended to be the type of hearing required by the *Iwakiri* case. However, by the time the hearing occurred, the *Iwakiri* guidelines had been issued and were central to the arguments of the parties before the court. Also, although the defendants argue the court did not review the depositions of King, Dr. Brooks and Gail Anderson before his ruling, the subject matter in those depositions, including quotes therefrom, was extensively discussed by counsel for both parties.

It is quite true, as defendants argue, that many of the safeguards of the *Iwakiri* case were not followed during King's hypnosis sessions. That, however, is no basis in itself to deny admission of the testimony. In *Iwakiri,* we discussed a line of cases which applied similar standards to those we recommended, but noted that those cases often included a *per se* application of such standards; *i.e.,* if the safeguards were followed the testimony is always admissible, and if the safeguards were not followed the testimony is never admissible. *Id.* at 624, 682 P.2d at 577. We specifically rejected such a *per se* rule as unnecessarily restrictive and adopted the *Iwakiri* rule "with the intent of giving guidance to trial

judges grappling with the difficult question of the admissibility of hypnotically induced or enhanced testimony." *Id.* at 625, 682 P.2d at 578.

Unfortunately, the record is entirely void of any evidence indicating whether the trial court used the standards set forth in *Iwakiri* in its assessment of King, Dr. Brooks and Gail Anderson as competent witnesses. We are particularly concerned that the trial court failed to consider any evidence beyond the arguments of counsel. It was upon these arguments alone that the trial court rendered its summary disposition of the defendants motion from the bench. In such circumstances, we would normally remand the case for an appropriate hearing pursuant to *Iwakiri.* The trial court would then be charged with determining whether, based on the totality of the circumstances of King's hypnosis, he and his hypnotists would be competent to testify. However, since the trial court's error has proved to be harmless, there is no need to remand.

Essentially, the only issue on which defendants focused their argument that King's recollection at trial was "enhanced" by hypnosis was as to the identity of the driver of the van at the time of the accident. In his December 22, 1981 deposition, King stated that the plan was to stop and change drivers and let Rick Quick have a chance to drive the van. However, he stated "I can't remember right now whether we stopped the van and switched drivers." (Deposition of 12/22/81 at p. 22.) In his March 30, 1982 deposition, after he had seen Dr. Brooks, King's memory was a bit clearer, but he still could not say for sure who was driving the van at the time of the accident. He said there were still some gaps in his memory. At trial, however, at least one of those gaps had been filled and King testified that he did recall that they stopped the van before entering the interstate and switched drivers so Rick Quick could have a chance to drive. King explained his prior inconsistencies by saying that, "At the time people had been telling me that I had been driving. In my own mind I knew that I wasn't but a lot of

people kept telling me I was driving, and so I said I probably—or probably my words were, I could have been driving." (Tr., at p. 413.)

King's testimony was quite effectively impeached by defense counsel who brought up King's prior statements in his deposition and brought up how he had undergone hypnosis in the meantime. Defendants were also able to impeach the techniques of Dr. Brooks and Gail Anderson, as well as the dangers of relying on hypnosis generally, through the testimony of their own psychologist Dr. David H. Groberg. This was a most legitimate line of inquiry, for although we stated in *Iwakiri* that a witness should not be able to buttress his testimony by revealing that his present recollection of the facts resulted from his hypnosis, we noted that

"If a party wishes then to impeach the competency of the witness who has been hypnotized because of the fact of hypnosis, or because of an inconsistent pre-hypnosis statement, he may cross-examine concerning the hypnosis, and both parties may then bring in experts to testify to the dangers and benefits of hypnosis as a rebuttal of the other party's assertions, which expert can then be rebutted." *Id.* at 626, 627, 682 P.2d at 579, 580.

As noted above, defense counsel followed up on both avenues of impeachment—the prior inconsistent statements and the dangers of hypnosis—to rebut King's present testimony as to who was actually driving at the time of the accident.

Defense counsel also questioned King about how he could have sustained injury to only his hip and leg if he were in the back seat and questioned him on how it was that he could have crawled over the driver's seat and out of the driver's door without noticing the body of Rick Quick. There was no dispute that the driver must have been either King or Quick and not Crane, who owned the van, since Crane was found trapped in the front passenger seat.

Defendant then presented evidence from a member of the fire department who was at the scene shortly after the accident. He graphically demonstrated the position in which he found Rick Quick's body as being wrapped around the engine cowling between the two front seats. Based on his experience, he stated that "there is no physical way" that Quick could have gotten in that position if he had been driving the van. Defendant brought in an expert in automobile accident reconstruction, Dr. Rudolph Limpert. He concluded that based on the position in which Rick Quick's body was found, he could not have been in the driver's seat at the time of impact. Dr. Limpert stated that Quick must have been in the middle of the back seat, and was then thrown forward like a human projectile on impact. Similarly, the doctor who performed the autopsy on Quick's body testified that based on Quick's injuries and his position in the van where his skull impacted the air conditioning unit, Quick could not have been in the driver's seat. There was very limited cross-examination of these witnesses on the issue of who was or wasn't in the driver's seat at the time of the accident.

The jury considered all this evidence and returned a verdict finding Johnny King nine times more negligent than Rick Quick. This verdict, when viewed in the context of the evidence and arguments at trial, clearly reveals that the jury must have found King to have been the driver. The jury did not accept King's story that the only reason he may have at first thought he was driving was because other people had told him so.

There was *no* evidence of negligence on the part of the passenger in the back seat, so even the one percent negligence attributed to Quick seems curious, but has not been challenged. At the same time, it seems eminently logical that of the three occupants of the van, it would be the driver to whom most of the negligence attributable to the van should be apportioned. The person in the van apportioned the largest percentage of negligence was King. He was the driver, as his own counsel even-

tually had to concede in oral argument before this Court.[5]

In spite of defendants' obvious victory on this issue in the jury verdict, they continue to argue that the trial court erred by not having a full evidentiary hearing before the trial pursuant to *Iwakiri* and, therefore, that the verdict must be vacated and the case remanded for a completely new trial to insure compliance with *Iwakiri*. Although we are inclined to agree that it was error for the trial court to permit King to testify—particularly with respect to whether or not he was driving—without such a hearing, to remand for a new trial on such grounds would so elevate form over substance as to make a mockery of the jury's verdict.

In a sense, defendants are the victim of their own success. They did such an effective job of discrediting King's story of who was driving the van that even if his hypnosis caused him to enhance or confabulate his recollection that he was not the driver, the jury clearly did not believe him anyway; and hence, the defendants were not prejudiced by the trial court's error. The harmless error rule aptly applies to this issue in the case since defendants have failed to show that the trial court's error was prejudicial to them. *See Viehweg v. Thompson*, 103 Idaho 265, 647 P.2d 311 (Ct.App.1982); *Annau v. Schutte*, 96 Idaho 704, 535 P.2d 1095 (1975).

**III**

### Disclosure of Settlements to Jury

In the original complaint filed in this action, Lori Quick, the widow of Rick Quick, filed suit against Turner, Sigman Meat Company and Rollins Leasing Corporation, as well as Johnny King and Jim Crane. King and Crane then joined Quick in filing claims for their injuries against Turner, Sigman and Rollins. Crane also filed a cross-claim against King, and King filed a cross-claim against Crane. Prior to trial on the claims by Crane and King against Turner, Sigman and Rollins (defendants), a settlement was reached between King and Crane whereby Crane released his claim against King in consideration for a $40,000 cash payment and payments of $450 per month for life with a 20-year guarantee. Crane's claim against King was then dismissed with prejudice by the court, approximately six months before trial. Crane also settled with Lori Quick prior to trial.

Shortly before trial, defendants moved to instruct the jury of the existence of the settlement between King and Crane and/or to admit the release agreement itself into evidence, along with any other agreements Crane had with other parties. Defendants argued that since King and Lori Quick were called as witnesses, their settlements with Crane should have been disclosed to insure the jury was aware of their interests

**5.** Although the defendants have only pointed to the issue of who was driving as reflecting upon the effects of hypnosis on King's testimony, King also testified to three other issues which were subject to dispute at trial. A comparison of the trial transcript and King's depositions, however, reveals that King's recollection of these issues was not substantially altered or "enhanced" by his hypnosis sessions. These issues are: whether the van slowed down upon entering the thick fog; whether the truck was stopped before impact; and whether the truck had any lights on. King's recollection at trial was that the van did slow down after it entered the thick fogbank. Similarly, in his first deposition, King specifically stated he "could feel a definite decrease in speed when we entered into the fog." (Deposition of 12/22/81 at p. 28.) Another of King's recollections at trial was that

the truck was "stopped dead" in the road before impact. In his deposition he stated that he did a double take when he saw the truck in the road because "it appeared to be stopped dead." (Deposition of 12/22/81 at p. 33.) Finally, King testified at trial that he could remember the truck had no lights on at the time of the collision. In his first deposition, he also stated "I can't remember seeing any lights on it at all." (Deposition of 12/22/81, a p. 57.) Again, his recollections on these issues may have appeared clearer at trial, but there was no substantial or material deviation between his trial testimony and his recollections as he described them in his deposition of December 22, 1981. Counsel for the defendants did not attempt to impeach King's testimony on these issues, nor did he raise them as grounds on this appeal for retrial pursuant to *Iwakiri*.

in the outcome of the case. The trial court denied defendants' motion.

It should be noted at the outset that the release with which the defendants are particularly interested—the one between King and Crane—was fully disclosed to the defendants and the court well before trial. It was written to conform to the requirements of I.C. §§ 6–805 and –806. Under I.C. § 6–806, the general rule is that a tortfeasor who settles with an injured party is still liable to make contribution to other tortfeasors, *unless* the release (1) is given before the rights of the other tortfeasors to secure judgment for contribution has accrued, and (2) provides for a reduction, of the injured party's total damages equal to the pro-rata share attributable to the released tortfeasors'. Since the release between King and Crane satisfied these two requirements, King is not liable to the defendants for contribution. The amount by which the release will reduce the injured party's damages is governed by I.C. § 6–805.

Defendants urge this Court to adopt the rule, followed in some jurisdictions, which allows the admission of settlement agreements between a plaintiff and one of the co-defendants so that the other co-defendants will not be unduly prejudiced. *Firestone Tire & Rubber Company v. Little*, 276 Ark. 571, 639 S.W.2d 726, 728 (1982); *Hegarty v. Campbell Soup Company*, 214 Neb. 716, 335 N.W.2d 758, 765 (1983); *General Motors Corporation v. Lahocki*, 286 Md. 714, 410 A.2d 1039, 1042 (1980). This rule of admissibility of settlements, however, governs only those types of settlement agreements known as "Mary Carter Agreements."[6] The term "Mary Carter Agreements" arises from the agreement popularized by the case of *Booth v. Mary Carter Paint Company*, 202 So.2d 8 (Fla. Dist.App.1967), and is used generally to

refer to any agreement between a plaintiff and one or some (but not all) of the defendants whereby the agreeing parties place limitations on the financial responsibility of the agreeing defendants, the amount of which is variable and usually is in some inverse ratio to the amount of recovery which the plaintiff is able to make against the non-agreeing defendants. *Soria, supra*, 111 Idaho at 603–04, 726 P.2d at 715–16; *Lahocki, supra* 410 A.2d at 1042 (citing *Maule Industries, Inc. v. Rountree*, 264 So.2d 445 (Fla.Dist.App.1972)).

The reason such agreements have been found to be admissible by some courts is because of the potential for misleading the judge or the jury as to the relationship between the plaintiff and one of the defendants when, in fact, they have an interest in common pursuant to a secret agreement; an interest that borders on collusion. *Ward v. Ochoa*, 284 S.2d 385, 387 (Fla. 1973). It is this element of secrecy that is condemned, particularly because of the advantageous position the agreeing defendant can put himself in by painting a gruesome picture of his co-defendant's conduct and even by making admissions against himself. *Id.; Lahocki, supra* 410 A.2d at 1042–43. Also, because the non-agreeing co-defendants are ignorant of such secret agreements, they are not in a position to bargain with the plaintiff on the same basis as if they had known of the agreement. In fact, depending upon the terms of the agreement, it may actually behove the plaintiff not to settle with the non-agreeing defendants. *Lahocki, supra* at 1045.

A review of the release agreement between Crane and King reveals that it comes neither within the definition of a "Mary Carter Agreement" nor within the policy justifications on which some courts have relied in admitting such settlement

---

**6.** Although many varieties of agreements may fall within the definition of a "Mary Carter Agreement," there are three basic features that must be present in any such agreement: (1) the agreeing defendant remains a party and defends himself against the plaintiff in court. His liability, however, is limited by the agreement. In some instances this will call for increased liability on the part of the co-defendants. (2) The agreement is secret. (3) the agreeing defendant guarantees that the plaintiff will receive a certain amount, notwithstanding the fact that he may not recover a judgment against the agreeing defendant, or that the verdict may be less than that specified in the agreement. *Lahocki, supra* 410 A.2d at 1042.

agreements to the jury. By the time this case got to trial, all of the parties that remained had been defendants in Lori Quick's initial suit. At trial, however, it was clear that there were two plaintiffs— each with his own injuries arising out of the same accident—and three co-defendants. The defendants were fully aware that King would conduct his case as a plaintiff against them and *not* as a co-defendant defending himself with the defendants against Crane. Hence, a critical element of a "Mary Carter Agreement"—that the agreeing defendant remain *as a defendant* to defend himself against the plaintiff—is not present here.

Furthermore, no matter whether King is characterized as a plaintiff or a co-defendant in the eyes of the jury, the defendants in this case clearly always operated under the assumption that to succeed they would have to prove that King was the driver of the van and was comparatively more negligent than Turner. They knew this even before the release agreement was made and Crane's complaint against King was dismissed. The defendants were able to fully prepare their case and reasonably anticipate the way Crane and King would present their cases. The secretive and collusive element that is inherent in "Mary Carter Agreements" is simply not present in the case at bar. In fact, the absence of collusiveness is apparent in the release itself which does not make the settlement amount variable depending upon the amount of recovery Crane is able to get from the defendants. *See Lahocki, supra* at 1042; *Hegarty, supra* 335 N.W.2d at 764.

Rather than being like a "Mary Carter Agreement," the release between King and Crane is similar to the so-called *Pierringer* -type agreement, as all parties in this appeal concede. *See Pierringer v. Hoger,* 21 Wis.2d 182, 124 N.W.2d 106 (1963). *Pierringer* releases are generally approved by the courts and are consistent with I.C. §§ 6–805 and –806. Basically, they entail an agreement whereby the plaintiff releases one co-defendant but reserves the right to proceed against the remaining defend-

ants. The nonsettling defendants' right to contribution can then be cut off by the plaintiff's agreement to indemnify the settling defendant against any claims of contribution. Under the terms of this type of release, the nonsettling defendants will not be required to pay more than their fair share as determined by the jury's finding of comparative negligence. *Frey v. Snelgrove,* 269 N.W.2d 918, 921 (Minn.1978). Defendants in the present case point to *Frey* as the basis for admission of the *Pierringer*-type release between King and Crane.

The court in *Frey* noted that if the plaintiff has agreed to indemnify the settling defendant against all possible cross-claims of the nonsettling defendants, the trial court should ordinarily dismiss the settling defendant from the case and, since he is deemed to have fixed his limits of financial liability, the settling defendant is deemed to have relinquished any cross-claims against the remaining defendants. *Id.* at 923. However, since the trial court will be submitting to the jury the issue of the fault of *all* the parties, including that of the dismissed settling defendant, the *Frey* court concluded that the jury should usually be informed that "there has been a settlement if for no other reason than to explain the settling tortfeasor's conspicuous absence from the courtroom." *Id.*

The present case is clearly distinguishable from *Frey* since the release at issue did not relinquish King's cross-claims against the defendants and since King was not dismissed from the case. The release did not fix the limit of King's liability, and King remained, as did Crane, a plaintiff in this action. Each conducted their own separate case against the defendants and the jury evaluated the interests and biases of each as plaintiffs. The rationale the *Frey* court relied upon in allowing the trial court, in its discretion, to permit a *Pierringer* -type release to be disclosed to the jury is clearly distinguishable.

Ultimately, there are problems with the defendants' argument that settlements,

even though they clearly do not involve "Mary Carter Agreements," must be disclosed simply because a settling party is called as a witness. To so hold would discourage almost all settlements in multi-party cases—including *Pierringer* releases which are agreed to in conformance with I.C. § 66–806—since normally the best witnesses are parties or former parties. Cases would go to the jury with far more parties and issues than necessary, at great expense to both the litigants and judicial system. Ironically, if we were to accept defendants' argument that Crane's settlements with King and Rick Quick's estate must be disclosed because King and Lori Quick were called as witnesses, then logically any settlements that the defendants themselves entered into with Rick Quick's estate would also have to be disclosed to the jury.

This Court has always held to the strong public policy favoring amicable settlement of litigation. *See Lomas & Nettleton Company v. Tiger Enterprises, Inc.*, 99 Idaho 539, 585 P.2d 949 (1978). To allow the disclosure of settlement agreements to the jury cannot but have the effect of discouraging parties from settling. There is a strong probability that a settlement may be regarded by the jury as an admission of liability. This policy against disclosure may be overcome in the event the settlement involves an agreement such as a "Mary Carter Agreement" and the parties moving for disclosure can prove they will be prejudiced by non-disclosure. Additionally, rule 408 of the Idaho Rules of Evidence "does not require exclusion of evidence relating to compromises or offers to compromise if the evidence being introduced is used to show witness bias or prejudice." *Soria, supra* 111 Idaho at 605, 726 P.2d at 717. However, trial judges have broad discretion in determining the admissibility of such evidence and their decision "will not be overturned absent a clear showing of abuse." *Id.* at 606, 726 P.2d at 718. Here, the King-Crane release is clearly not a "Mary Carter Agreement" and, we find that the trial court did not abuse its discretion by excluding the agree-ment. We therefore hold that the district court did not err in refusing to disclose the existence of the release agreement, or the release itself.

IV

**Seat Belt Defense**

Defendants next argue that it was error for the trial court to exclude evidence or instruct the jury on the seat belt defense. The plaintiffs' non-use of seat belts at the time of the accident, they argue, is evidence of the plaintiffs' comparative negligence and/or is evidence of the plaintiffs' failure to mitigate damages.

As to the first part of defendants' argument—that the plaintiff's non-use of seat belts was evidence of their comparative negligence—the case of *Hansen v. Howard O. Miller, Inc.*, 93 Idaho 314, 460 P.2d 739 (1969), is dispositive. In *Hansen*, we held that the fact that a plaintiff was not using his seat belt at the time of the accident is not admissible as evidence that he was contributorily negligent. *Id.* at 317, 460 P.2d at 742. The reason for this rule is the lack of connection between failure to wear a seat belt and the occurrence of the accident. *Id.* at 318, 460 P.2d at 743; *Barry v. Coca-Cola Co.*, 99 N.J.Super. 270, 239 A.2d 273 (1967). This reason is as valid today as it was when we first decided *Hansen*, whether under the principles of contributory negligence, or modern comparative negligence. We, therefore, reaffirm *Hansen* and hold that the district court did not err in prohibiting the admission of evidence of plaintiffs' non-use of seat belts as evidence of their contributory negligence or comparative fault.

This Court has not yet ruled on the second part of defendants' argument that such evidence should be admitted to show plaintiffs' failure to mitigate damages. However, we conclude that the trial court did not err in denying the admission of such evidence in this case for the purpose of showing plaintiffs alleged failure to mitigate damages. A defendant should not be

able to diminish the consequences of his negligence merely by the plaintiff's failure to anticipate that negligence. *Amend v. Bell,* 89 Wash.2d 124, 570 P.2d 138, 143 (1977); *Kopischke v. First Continental Corp.,* 187 Mont. 471, 610 P.2d 668, 683 (1980). A majority of jurisdictions which have considered the question have rejected the seat belt defense. *See Amend, supra* 89 Wash.2d at 143–44, 570 P.2d 668. We agree with this majority rule, and affirm the trial court's order on this issue.[7]

## V

### Jury Instructions on Damages

[26] Defendants next argue that the trial court erred by refusing to instruct the jury on the reduction to present value of damages for future lost earnings; by refusing to give an instruction on present value determinations for future medical expenses; and by refusing to submit a special verdict form which would delineate the jury's calculations of present damages from future damages. A review of the instructions in light of the evidence presented at trial leads to the conclusion that the trial court did not err in denying defendants' requested instructions.

King and Crane did not request and did not put on evidence in support of future lost earnings. This is exactly what defendants' counsel admitted when he argued in his post-trial motion for a new trial based on the alleged excessiveness of damages. He said as to Crane that there was "[n]o future earning impairment, they didn't present evidence, Your Honor, that this man is going to be able to work in the future." (Tr., Vol. V, p. 830) The defendants reiterated this in their discussion of the excessiveness of damages in their brief before this Court. Yet, defendants are now contradicting themselves and arguing that plaintiffs did put on evidence of future lost earnings. Defendants point to refer-

ences in the trial transcript of Crane's permanent impairment and how limited Crane will be in his ability to perform tasks that he could formerly perform without difficulty. These references could be used to infer Crane may suffer loss of earnings in the future, but such an inference could be drawn from *any* evidence of injuries that will persist into the future. Crane's counsel did not argue to the jury that they should draw such inferences, neither did he put on evidence that would in any way assist the jury in quantifying future lost earnings. The same is even more true of King's case. In fact, if an instruction of future lost earnings had been given, the jury would have been put on notice that they were suppose to add in such damages and the verdicts for both King and Crane would have likely been higher.

Interrelated to this issue is defendants' next argument that the trial court should have given a present value instruction because Instruction Nos. 18 and 19 given by the court stated in part:

"The reasonable value of necessary medical, hospital, ambulance and therapy care, services, supplies and devices received as a result of the injury, and the present cash value of similar items reasonable, certain and necessary to be required in the future;"

Crane did not request or argue for compensation for medical services which may be necessary in the future. Again, there was evidence to indicate Crane's medical condition may persist into the future, but the doctors who testified on the subject discounted the need for any more surgery or related services absent unforeseen changes. King also did not request or argue for compensation for future medical services, and there is even less evidence from which the jury could infer such services might be needed in the future. Furthermore, since no party presented evidence or suggested a method of present value reduc-

---

7. It should be noted that Idaho had no law requiring the mandatory use of seat belts at the time of the accident in this case. Although a mandatory seat belt law has subsequently been enacted this year (H.B. 414, 48th Legislature, 2nd Session), we specifically decline to rule on whether it will have an effect on the admissibility of the non-use of seat belts in automobile accident litigation.

tion, an instruction would have been both confusing and superfluous. Therefore, the trial court did not err in its refusal to instruct the jury on the calculation of present value.

■ Finally, defendants argue that the trial court erred by not submitting a special verdict form which would specifically delineate the jury's calculation of present damages from its calculation of future damages. The trial court's authority to select a special verdict form is governed by I.R.C.P. 49(a). We have held that the trial court has given broad discretion under this rule to determine the nature and form of this special verdict. *Garrett v. Nobles*, 102 Idaho 369, 374, 630 P.2d 656, 661 (1981). Rule 49(a) does not mandate that if a special verdict form is used the trial court must delineate the special damages from the general damages. To make such a delineation is within the trial court's broad discretion and the defendants have failed to establish that the trial court abused its discretion or that such abuse was prejudicial to their case.

## VI

### Closing Argument and I.C. § 10–111

■ Defendants' final argument is based on certain remarks made by counsel for Crane in his closing argument which were allegedly in violation of I.C. § 10–111. That section prohibits the court, counsel or any party from disclosing to the jury the amount of general damages sued for in the complaint. Without getting into whether the comments by Crane's attorney constituted an actual violation of this section, defendants must fail on this argument because they made no objection at the time the alleged improper comments were made. *Leliefield v. Johnson*, 104 Idaho 357, 372, 659 P.2d 111, 126 (1983). Therefore, even if the objection is valid, it is deemed to be waived. *Id.*

## VII

### Cross-Appeal on Credits of Settlements Against the Verdict

Crane has filed a cross-appeal in this action seeking a review of the method by which the trial court offset Crane's verdict by the amounts he received in settlements prior to trial. The trial court concluded that the verdict should be credited for either the total amount of settlement actually received by Crane or the proportionate share of negligence borne by Crane and the parties with whom he settled, whichever was greater. As noted above, the negligence assessment of the jury was:

| Parties | Percentage of Negligence |
|---|---|
| Turner, Sigman Meat Co. and Rollins Leasing Corp. | 87% |
| Johnny King | 9% |
| Jim Crane | 2% |
| Rick Quick | 1% |
| Penny Caldwell | 1% |

The settlement sums received by Crane from other parties who were involved in the accident were:

| Parties | Settlement Sums |
|---|---|
| Johnny King | $ 40,000 + $450 per month guaranteed for 20 years, which total consideration amounts to approximately $ 89,513. |
| Rick Quick | $ 20,000 |
| Penny Caldwell | $ 7,500 |
| Roger Orme | $ 9,500 |
| **Total Settlements** | **$126,513** |

The trial court first deducted from Crane's $1,000,000 verdict the $20,000 which represented his 2% share of the negligence assessment. The court then determined that the amount Crane received in settlements was greater than the total 11% negligence assessment of the persons with whom he settled ($126,513 as opposed to $110,000). Therefore, $1,000,000 minus $20,000 minus $126,513 yielded a net recovery for Crane of $853,487.

Crane points out that based on the common law rule of joint and several liability, in a multiple defendant action if a defendant's negligence is less than that of a plaintiff, the less-negligent defendant is not liable to the plaintiff or to the other defendants. Therefore, Crane argues, any pre-

trial settlement reached with a less-negligent defendant should not be used as a credit to reduce the plaintiff's ultimate recovery. In other words, a defendant must be jointly and severally *liable* for the plaintiff's injury before he can be deemed a "joint tortfeasor." *See Scalf v. Payne*, 266 Ark. 231, 583 S.W.2d 51 (1979).

In this case, since neither Rick Quick nor Penny Caldwell would be jointly and severally liable to Crane, Quick and Caldwell should not be considered "joint tortfeasors" as used in Idaho's statute on contribution among joint tortfeasors, I.C. § 6–801 *et seq.* Furthermore, because Roger Orme was not included on the special verdict and no evidence of his negligence was submitted by any party, he cannot be deemed to be a "joint tortfeasor" either. Thus, the settlement these parties had with Crane should not be used as a credit against Crane's verdict.

We disagree with Crane's argument and hold that the trial court correctly applied the law on the effect of settlement on the verdict pursuant to I.C. § 6–805. That section reads:

> "**Effect of release of one tortfeasor on liability of others.**—A release by the injured person of one (1) joint tortfeasor, whether before or after judgment, does not discharge the other tortfeasors unless the release so provides, but reduces the claim against the other tortfeasors in the amount of the consideration paid for the release, or in any amount or proportion by which the release provides that the total claim shall be reduced, if such amount or proportion is greater than the consideration paid."

Crane's argument hinges on the meaning of "joint tortfeasor" as used in this statute. The term "joint tortfeasor" is defined in I.C. § 6–803(4) which reads, "As used herein, 'joint tortfeasor' means one (1) of two (2) or more persons jointly or severally liable in tort for the same injury to person or property, whether or not judgment has been received against all or some of them." As the trial court correctly observed, this definition is somewhat confusing because in the first clause it refers to a person who is jointly and severally liable, but in the last clause it clouds the meaning of liability by stating that judgment need not be recovered against the person to make him a joint tortfeasor.

We have reviewed the case law in other jurisdictions operating under statutes similar to that of Idaho. Our search reveals that the more widely accepted view is that under provisions such as I.C. § 6–805, the amount a plaintiff receives in settlement from a party should be deducted from the plaintiff's judgment even though the settling party was never judicially determined technically to be a joint tortfeasor. *Duncan v. Pennington County H.A.*, 283 N.W.2d 546, 550 (S.D.1979). Or, put another way, the trial court's determination whether a settling party is a joint tortfeasor must be based on the pleadings and not the jury's apportionment of liability. *Id.; Rosenbaum v. First American National Bank of Nashville*, 690 S.W.2d 873, 879 (Tenn.App.1985). As the Supreme Court of North Dakota aptly stated in *Levi v. Montgomery*, 120 N.W.2d 383 (N.D. 1963):

> "Thus the question at issue between the parties is determined by the pleadings. Even though the plaintiff now contends that he, in fact, had no cause of action in tort against one of the defendants, the court will consider the issues as framed by the pleadings. Where the plaintiff charges several defendants with tort, and one of the defendants buys its way out of the suit and is given a release and covenant not to sue, the court will not go into the question of liability of such defendant. The test in such case is: was the defendant sued as a tort-feasor? If so, any liability of the remaining defendants to the plaintiff must be reduced by the amount paid for such release or covenant not to sue by such defendant. The question of actual liability in tort of any of the defendants so discharged by release and covenant not to sue is wholly immaterial. The release and covenant not to sue discharges such defendant

from any possible liability for any tort of which such defendant possibly might have been guilty. Whether he was, in fact, guilty of tort is immaterial where such defendant does not desire to try out the question and is willing to pay consideration and in good faith secure such release and covenant not to sue." *Id.* at 388–89.

This is the majority view and we find it persuasive. *See Duncan, supra* at 551; Prosser, Law of Torts, § 49, p. 305 (4th Edition 1971). This view is similarly reflected in the Restatement (Second) of Torts § 885(3) (1977) which states:

"A payment by any person made in compensation of a claim for a harm for which others are liable as tort-feasors diminishes the claim against the tort-feasors, at least to the extent of the payment made, whether or not the person making the payment is liable to the injured person and whether or not it is so agreed at the time of payment or the payment is made before or after judgment."

The comment following this section states in part:

"Payments made by one who is not himself liable as a joint-tortfeasor will go to diminish the claim of the injured person against others responsible for the same harm if they are made in compensation of that claim.... These payments are commonly made by one who fears that he may be held liable as a tort-feasor and who turns out not to be."

*See also Wadle v. Jones*, 312 N.W.2d 510, 514–15 (Iowa 1981); *Luth v. Rogers & Babler Construction Co.*, 507 P.2d 761, 766 (Ala.1973).

Crane argues that he should be able to retain the benefits of his favorable settlements with other parties whose negligence is determined to be less than his. Similarly, Crane notes that the non-settling defendants should not be able to take advantage of these settlements to which they were not a party. We disagree based on the fundamental concept that a jury's damage verdict represents the total amount by which the plaintiff should be compensated. It is based on the plaintiff's injuries and how much he should be paid to alleviate those injuries, and is not based on how much a particular defendant should pay. The plaintiff does bear the risk of settling with a party whose proportionate negligence found by the jury may represent a greater monetary amount than the actual settlement amounts he has received. The benefit the plaintiff receives for taking these risks is that he is relieved of the expense and the burden of proof in putting on a case against the settling party. The fact that the plaintiff agrees to bear these risks by settling with some of the parties, however, does not mean he should recover more than the amount by which the jury determines he should be compensated, which in this case is one million dollars.

Therefore, we agree with the trial court, the Restatement (Second) of Torts and the majority of jurisdictions that have ruled on this issue and hold that the amount of Crane's settlements with other parties in the case could be credited against Crane's total verdict whether or not they were found to be liable to Crane.

In conclusion, the order of the trial court denying the defendants' motions for a new trial and remittitur of damages is reversed and remanded for a determination of those motions consistent with this opinion. The trial court is affirmed on all other issues that were raised on appeal.

The order of the trial court making such credits is affirmed.

No costs or attorney fees on appeal.

BISTLINE and HUNTLEY, JJ., concur.

SHEPARD, J., concurs in the result.

BAKES, J., concurs in Parts I, IV, V, VI and VII.

BAKES, Justice, concurring specially:

Regarding Part I of the majority opinion, it is clear that the trial court did not carry out its proper function under *Dinneen v. Finch*, 100 Idaho 620, 603 P.2d 575 (1979), and, accordingly, this matter must be re-

manded for the trial court to make that determination. I write only to comment on: (1) new trial motions under I.R.C.P. 59(a)(5); (2) the *Iwakiri* standards; and (3) policy regarding disclosure of settlement agreements to the jury.

## I

### *Motions for New Trial under 59(a)(5)*

I endorse Chief Justice Donaldson's assertion today that our decision in *Dinneen v. Finch, supra,* provides the controlling legal principles regarding the role of trial courts in ruling on motions under 59(a)(5) and the role of this Court in reviewing the grant or denial of such motions. As his opinion points out, the holding in *Dinneen* is legally sound and has been followed and applied consistently by this Court, twice in just the last year. *Vannoy v. Uniroyal,* 111 Idaho 536, 726 P.2d 648 (1986); *Black v. Reynolds,* 109 Idaho 277, 707 P.2d 388 (1985). Today's opinion clearly points out the distinction between the post-verdict motions of judgment n.o.v., new trial under 59(a)(6), and new trial under 59(a)(5), and it reaffirms the pre-eminent role of the standards set forth in *Dinneen* in deciding new trial motions under Rule 59(a)(5).

It would not be necessary to write more on this issue, except for the unfortunate misapplication of some of the language from Chief Justice Donaldson's opinion in this case by Justice Huntley in his opinion in the companion case of *Sanchez v. Galey,* (Sup.Ct. No. 15918, filed Oct. 17, 1986), Petition for Rehearing pending (1986). In the *Sanchez* case, Justice Huntley, writing what appears to be only a plurality opinion on the Rule 59(a)(5) issue, assumes that the Court's opinion today in this case has altered the *Dinneen* standard, changing it from "an appearance of passion or prejudice" to a "shocks the conscience" test. Nothing in this case supports that assumption in Justice Huntley's opinion in *Sanchez v. Galey.* It is contrary to the express wording of I.R.C.P. 59(a)(5) which adopts the "passion or prejudice" standard.

In Part I of the Court's opinion today, Chief Justice Donaldson states, "In ruling upon a motion for a new trial premised upon inadequate or excessive damages, the rule the trial court must follow is set forth in *Dinneen v. Finch,....*" Then, quoting from *Dinneen,* his opinion in this case states that, in evaluating

> " 'a motion for a new trial ... premised on inadequate or excessive damages, the trial court *must* weigh the evidence and then compare the jury's award to what he would have given had there been no jury. If the disparity is so great that it appears to the trial court that the award was given *under the influence of passion or prejudice,* the verdict ought not stand. *It need not be proven that there was in fact passion or prejudice nor is it necessary to point to such in the record. The appearance of such is sufficient.'* " *Ante* at 768, 727 P.2d at 1196. (Emphasis added.)

In commenting upon how much disparity must exist in order to justify the "appearance of passion or prejudice," Chief Justice Donaldson states:

> "How substantial this difference must be is impossible to formulate with any degree of accuracy. It will necessarily vary with the factual context of each case and the trial judge's sense of fairness and justice. Frequent characterizations have included the idea that the disparity must 'shock the conscience' of the trial judge or lead him to conclude that it would be 'unconscionable' to let the damage award stand as the jury set it. (Citing cases.) These characterizations, of course, do little more than restate the trial judge's discretionary perspective but are, nonetheless, frequently employed in other areas of the law and, therefore, may be useful to the trial judge." *Ante* at 769–770, 727 P.2d at 1197–1198.

There is nothing in that statement suggesting that today's opinion in this case either clarifies, changes or modifies the "passion or prejudice" standard of Rule 59(a)(5) and the *Dinneen* case which the Court today reaffirms. As Chief Justice Donaldson's opinion states, those characterizations are from "other areas of the law" and, while they "do little more than restate the trial judge's discretionary perspective," they

"may" be useful to the trial judge. Regardless of those other characterizations, the Court's opinion today does not change the *Dinneen* standard that

"the trial court must weigh the evidence and then compare the jury's award to what he would have given had there been no jury. If the disparity is so great that it appears to the trial court that the award was given under the influence of passion or prejudice, the verdict ought not stand. It need not be proven that there was in fact passion or prejudice nor is it necessary to point to such in the record. The appearance of such is sufficient." *Dinneen v. Finch,* 100 Idaho at 625–26, 603 P.2d at 580–81.

Nothing in today's opinion supports the statements by Justice Huntley in his opinion in *Sanchez v. Galey, supra,* that today's opinion modifies the *Dinneen* standard. Since Chief Justice Donaldson's opinion in this case expressly states that the degree of difference or disparity between the determinations of damages by judge and jury such as will allow granting a new trial *cannot* be "formulate[d] *with any degree of accuracy,"* ante at 1197 (emphasis added), it is clear that a "shock the conscience" standard would add little or nothing to the *Dinneen* standard. Chief Justice Donaldson's opinion recognizes as much by its statement that "these characterizations, of course, do little more than restate the trial judge's discretionary perspective...." *Ante* at 1198.[1] Furthermore, such characterizations, if they became the test, would introduce ambiguity and uncertainty in the form of the purely subjective conscience of the particular judge.

Thus, I concur in the Court's analysis in this case which upholds the rule set forth in *Dinneen* without the addition of the so-called "shock the conscience" standard to the "passion or prejudice" standard which Rule 59(a)(5) has expressly adopted.

Again, as we held in *Dinneen,* when faced with a motion for new trial under 59(a)(5):

"[T]he trial court *must* weigh the evidence and then compare the jury's award to what he would have given had there been no jury. If the disparity is so great that it appears to the trial court that the award was given under the influence of *passion or prejudice,* the verdict ought not stand. It need *not* be proven that there was in fact *passion or prejudice* nor is it necessary to point to such in the record. The appearance of such is sufficient. A trial court is not restricted to ruling a verdict inadequate or excessive 'as a matter of law.' (Citation omitted.) Additionally, the rule that a verdict will not be set aside when supported by substantial but conflicting evidence has no application to a trial court ruling upon a motion for a new trial." *Dinneen v. Finch,* 100 Idaho at 625–626, 603 P.2d at 580–81 (emphasis in original).

When such a ruling is appealed, *Dinneen* also describes the scope of appellate review:

"This court is firmly committed to the rule that a trial court possesses a discretion to be wisely exercised in granting or refusing to grant a new trial and that such discretion will not be disturbed on appeal unless it clearly appears to have been exercised unwisely and to have been manifestly abused. *Sanchotena v. Tower Co.,* 74 Idaho 541, 546, 264 P.2d 1021, 1024 (1953)." *Dinneen v. Finch,* 100 Idaho at 626, 603 P.2d at 581.

To enable us to adequately discharge our appellate review function, I fully concur in the conclusion in today's opinion that trial court's must set forth their basis and reasoning for granting or denying motions for new trial. The trial court did not do that in this case, and this Court correctly reverses and remands this case to the trial court to perform the *Dinneen* analysis. However, it bears repeating from *Dinneen* that, once

---

1. Chief Justice Donaldson's opinion also correctly points out that characterizations such as "shock the conscience" and "unconscionable" are borrowed from "other areas of the law" such as contracts. They have never been used in our Idaho cases concerning motions for new trial.

the trial court has correctly applied *Dinneen,* our review on appeal is limited to whether or not the trial court's discretion "clearly appears to have been exercised unwisely and to have been manifestly abused." *Dinneen v. Finch,* 100 Idaho at 626, 603 P.2d at 581.

## II

### Admissibility of Hypnotically-induced Testimony

As the Court's opinion points out, "the record is entirely void of any evidence indicating whether the trial court used the standard set forth in *Iwakari* in its assessment of King, Dr. Brooks, and Gale Anderson as competent witnesses". *Ante* at 775, 727 P.2d at 1203. Since the opinion in *State v. Iwakari,* 106 Idaho 618, 682 P.2d 571 (1984), had only been released one week prior to the trial in this matter, it would have been understandable had that case not even been called to the trial court's attention. However, the record reflects that the parties were aware of the case and its requirements for specific findings to be made by the trial court before hypnotically-induced testimony is admitted into evidence were pointed out to the trial court. The majority opinion states "that many of the safeguards of the *Iwakari* case were not followed during King's hypnosis sessions." *Ante* at 775, 727 P.2d at 1203. Actually, from the record it appears that none of the six safeguards described in *Iwakari* were followed in the hypnotic sessions with the witness, Johnny King. Furthermore, at the hearing the trial court did not compare any statements or depositions of the witnesses made prior to hypnosis with the hypnotically enhanced testimony to determine whether any distortion or confabulation had occurred. Nevertheless, the majority of the Court, after recognizing that fact, states that such a failure "is no basis in itself to deny admission of the testimony." *Ante* at 775, 727 P.2d at 1203. However, in *Iwakari* we stated "that it would be an unusual case where admission of the testimony would be allowed where none of the safeguards mentioned were followed." 106 Idaho at 626, 603 P.2d at 581.

Since this matter is being remanded to the trial court for a hearing to make the necessary findings on the motions for new trial, as set out in Part I of the majority opinion, we should remand the hypnosis issue to the trial court to conduct the hearing mandated by our decision in *State v. Iwakari, supra.* The decision on the question of the prejudice resulting from error in failing to conduct the necessary hearings and apply the appropriate standards of *Iwakari* should be made in the first instance by the trial court which conducted the case, and not by this Court on appeal on a harmless error standard as the Court has done in this case.

## III.

### Disclosure of Settlement Agreements to the Jury

The Court's analysis of this issue is less than clear and stems largely from its inability to distinguish between the two settlement agreements at issue in this case. There are two settlement agreements at issue on appeal. One between James Crane and Lori Quick, and another between James Crane and Johnny King.

Crane and Quick are nominally adverse parties in this lawsuit while Crane and King are not. Crane and King are co-defendants, along with Turner, Rollins Leasing and Sigman Meat Co., in the action brought by Quick. Crane and King are likewise non-adverse parties in their cross-claims against Turner, Rollins Leasing and Sigman Meat; in that action they are co-plaintiffs. The settlement agreement between Crane and King, nominally non-adverse parties, presents no danger of misleading the jury as to any bias resulting from the interests these parties have in the outcome of the action involved in their settlement.

The same cannot be said, however, regarding the settlement agreement between Crane and Quick. They are nominally adverse parties in the action involved in their settlement and, therefore, the jury naturally believed they had divergent or opposing interests in the outcome of that action and

judged their testimony accordingly. The failure to disclose the existence of the settlement agreement between Crane and Quick presents a very real danger of misleading the jury regarding the adverseness of those parties. The natural consequence of thus misleading the jury is that the jury will also be hampered in its ability to judge witness credibility, *e.g.*, bias or prejudice. In such cases, counsel for the nonsettling party (be it plaintiff or defendant) is prohibited during cross-examination of such witnesses from disclosing possible bias or prejudice. Prohibiting disclosure of settlement agreements in such circumstances undermines the truth finding function of our jury trial system. The majority completely overlooks this strong policy argument in favor of disclosing settlement agreements, a policy argument clearly *not* overlooked by the drafters of Rule 408 of our rules of evidence.

The inability of the majority to recognize this strong policy argument in favor of disclosure stems, as it did in *Soria v. Sierra Pacific Airlines*, 111 Idaho 594, 726 P.2d 706 (1986), from focusing too narrowly on the so-called "Mary Carter" agreement issue.[2] As I argued in my dissent in *Soria*, whether a particular settlement agreement is a "Mary Carter" agreement is not the issue insofar as disclosure of settlement agreements is concerned.[3] The controlling principle of law regarding disclosure of settlement agreements is contained in Rule 408 of the Idaho Rules of Evidence.[4] Rule 408 expressly provides that settlement agreements may be disclosed to the jury for purposes of showing witness bias or prejudice, *e.g.*, non-adverseness of parties.[5]

**2.** The issues raised by "Mary Carter" agreements are generally twofold: (1) whether such agreements should be disclosed to juries; and (2) whether such agreements should be prohibited entirely on grounds of violating public policy. The first issue is answered by our Evidence Rule 408, which is or should be controlling. The second issue has not be addressed by this Court and is not raised by the facts of this case. However, strong arguments exist in support of prohibiting such agreements as contrary to public policy. *See* Comment, *Mary Carter Agreements: Unfair and Unnecessary*, 32 S.W.L.J. 779 (1978).

**3.** If the disclosure issue of "Mary Carter" agreements were before the Court, I think the majority defines such agreements far too narrowly. Rather than setting forth an absolute checklist of narrowly defined elements, proper focus should be on the purpose of such an agreement. As noted by the Florida Court of Appeals in *Maule Industries, Inc. v. Rountree*, 264 So.2d 445, 447 (Fla.App.1972) (cited by majority *ante* at 1206), "[t]he number of variations of the so-called 'Mary Carter Agreement' is limited only by the ingenuity of counsel and the willingness of the parties to sign." By focusing on the purpose of the agreement, the Court would avoid exalting form over substance.

"[T]he plaintiff's major objective in entering a Mary Carter agreement is the solicitation of assistance in his cause against the remaining defendants." Comment, *Mary Carter Agreements: Unfair and Unnecessary*, 32 S.W. L.J. 779, 780 (1978). The reason this makes the agreement so opprobrious is that it distorts, if not completely undermines, the adversarial nature of our system of justice. "[T]he real prejudice is caused by the jury's inability to evaluate the testimony of witnesses and the position of counsel.... Complete candor with the court and opposing counsel will not eradicate the damage caused by the false appearance of an adversary proceeding." *Id.* at 784. In the present case, if, the issue of liability between Quick and Crane was fully settled as claimed, then there is no reason why Crane should not have been dismissed as to Quick's action against him and his co-defendants. Retaining Crane as a nominal defendant raises the question of why he is being kept in the trial. In the Mary Carter scenario, the presence of such a defendant (in name only) usually is only for the express purpose of "enlist[ing] support from the settling defendant and disguis[ing] him as an adversary, when he is actually a member of the plaintiff's camp." *Id.* at 787. If we would adopt a definition of a "Mary Carter" agreement which focuses on substance rather than form, we should be inclined to examine more carefully this issue of disclosure of the agreement in the present case.

**4.** Although I.R.E. 408 did not become effective until July 1, 1985, this Court had previously adopted its identical federal counterpart, F.R.E. 408, *in toto*, in *Hatfield v. Max Rouse & Sons Northwest*, 100 Idaho 840, 606 P.2d 944 (1980). Our action in adopting the provisions of F.R.E. 408 preceded the filing of the lawsuit in the present case.

**5.** As indicated in my dissent in *Soria*, courts which have considered the issue have uniformly held that under Rule 408 disclosure of settlement agreements is permissible to prevent misleading the jury as to adverseness of the parties. *See Brocklesby v. United States*, 767 F.2d 1288 (9th Cir.1985); *Belton v. Fibreboard Corp.*, 724

Rule 408 strikes the balance between the competing policy arguments for and against disclosure of settlement agreements. The majority's belabored discussion of the policy arguments against disclosure is not only unnecessary, but counters the express policy behind Evidence Rule 408, which this Court recently adopted. The rule is unambiguous; it speaks for itself.

If a party moves for disclosure of a settlement agreement for purposes of showing witness bias, as was done in this case, the trial court should permit disclosure of the settlement agreement. The exception would be if the party opposing disclosure is able to show to the satisfaction of the trial court that the probative value of such evidence is *"substantially* outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." I.R.E. 403 (emphasis added). The parties opposing disclosure of the settlement agreement between Crane and Quick made no such showing in this case. Furthermore, it does not appear from the record before us that the trial judge made the requisite Rule 403 determination that the probative value of the evidence is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury...."

Since we are remanding this case to the trial court for a redetermination regarding the motions for new trial, we should also remand for the trial court to consider the apparent error regarding disclosure of the settlement agreement between Crane and Quick.

F.2d 500 (5th Cir.1984); *Reichenbach v. Smith,* 528 F.2d 1072 (5th Cir.1976) ("The importance of informing the jurors fully so that they can carefully judge the credibility of each witness in making their fact determination may in some situations outweigh the desire to encourage settlements.").