**IN THE SUPREME COURT OF THE STATE OF IDAHO**
**Docket No. 45052**

SILVERWING AT SANDPOINT, LLC,
an Idaho limited liability company,

        Plaintiff-Respondent,

v.

BONNER COUNTY, an Idaho municipal
corporation,

        Defendant-Appellant.

_____

)
)
)
)
)
)
)
)
)
)
)
)
)
)

Boise, August, 2018 Term

Filed: February 26, 2019

Karel A. Lehrman, Clerk

Appeal from the District Court of the First Judicial District of the State of Idaho, Bonner County.  Hon. Richard Christensen, District Judge.

The district court's ruling on the County's Motion for Judgment Notwithstanding the Verdict is <u>reversed</u> and this case is <u>remanded</u> to the district court for action consistent with  this Opinion. The judgments in favor of SilverWing are <u>vacated</u>.  No attorney fees on appeal are awarded to either party. Costs to appellant.

Bonner County Prosecutor's Office, Sandpoint, Murphey Law Office, PLLC, Coeur d'Alene and Buchalter, a Professional Corporation, Irvine, California, attorneys for appellant. Paul J. Fraidenburgh argued.

Givens Pursley, LLP, Boise and Anderson & Kreiger, LLP, Boston, Massachusetts, attorneys for respondent. Debora K. Kristensen argued.
_____

BEVAN, Justice

## I. NATURE OF THE CASE

This appeal arises from a dispute grounded in promissory estoppel between SilverWing at Sandpoint, LLC ("SilverWing") and Appellant Bonner County (the "County"). SilverWing sought to develop a residential hangar and taxiway adjacent to the Sandpoint Airport for residents who wished to park their aircraft in their home garage. SilverWing alleged that "[i]n 2007, the County provided to SilverWing an ALP that reflected the existing location of the Airport's runway, and made no mention or reference to any plans for the runway to be moved.

1

At the same time, the County promised that there were no plans regarding changes to runway location which would be incompatible with SilverWing's development."

During the initial stages of engineering for the development, the County informed SilverWing that it needed to move the taxiway from where it was originally planned onto County-owned airport property, to accord with the County's Airport Layout Plan (ALP). SilverWing proceeded with its development based on the County's assurances, and built a taxiway and other infrastructure, including streets, to support its development. Once the taxiway was built, SilverWing learned that the placement of the taxiway was not approved by the FAA. After several years of legal maneuvering, SilverWing proceeded against the County in court, ultimately on a theory of promissory estoppel.

After trial, a jury returned a verdict in favor of SilverWing. The County then filed a motion for judgment notwithstanding the verdict ("JNOV"), which the district court denied. The County now appeals, arguing: (1) the district court erred in denying the County's JNOV on any of nine stated grounds; (2) the district court erred in awarding SilverWing attorney fees under Idaho Code section 12-120(3) for the promissory estoppel claim; and (3) the County should be awarded its attorney fees and costs incurred in the district court and as a result of this appeal. We reverse the district court's ruling on the JNOV and vacate its ruling regarding attorney fees and remand this case to the district court for action consistent with this Opinion. We decline to award either party attorney fees in this case.

## II. FACTUAL AND PROCEDURAL BACKGROUND

This case is about the development of a residential/hangar combination property adjacent to the Sandpoint Airport (the "Airport"). The Airport is a general aviation airport owned and operated by the County. In April 2006, John McKeown purchased 18.1 acres of land (the "property") directly bordering the west side of the Airport, and later conveyed the property to an entity formed on October 25, 2006, that ultimately became SilverWing. McKeown was the managing member of the LLC.

SilverWing intended to design and construct a 45-unit Planned Unit Development ("PUD") of hangar structures near the Airport which included optional second-floor residences. As planned, residents could taxi their airplanes directly between the Airport runway and their hangar homes. SilverWing's purchase included a perpetual "Taxi Way Easement" (the "easement") from the County in favor of SilverWing for access to the runway at an access point

2

in the middle of the runway or "mid-field." Thus, from the outset, a crucial aspect of the development was the ability for residents to have direct access in their airplanes from their hangar homes to the Airport's runway.

Shortly after SilverWing purchased the property, it hired an airport design expert who developed an architectural design and site plan for the PUD. The design included a parallel taxiway that was intended to be constructed on the property, allowing SilverWing residents to exit their residences/hangars in their airplanes, making their way to the mid-field access point on the Airport runway provided by the easement.

Upon learning of SilverWing's purchase, in the summer of 2006, the Airport Board, through its vice-chair Sol Pusey, requested by email that SilverWing provide it with the plans for the property and a construction schedule. Mr. Pusey also informed SilverWing that the Board had been working with the FAA about installation of a west-side taxiway. McKeown, testifying on behalf of SilverWing, stated that he initially knew nothing about the need to construct the west-side taxiway in the location directed by the County.

McKeown also had email correspondence discussing the planned development "all the time" with Jorge O'Leary, who held a contract with the County to manage the Airport. O'Leary confirmed with McKeown that O'Leary was the Airport Manager, and he told McKeown not to "hesitate to contact me directly on airport matters." Based on his interaction with O'Leary, McKeown emailed a copy of the initial site plan to O'Leary. McKeown testified further that the response from the Airport Board and O'Leary regarding SilverWing's plans was "[g]reat" and that "everyone was very excited . . . everyone thought it was a great design . . . . It was all really positive." Based on the ongoing interactions among McKeown, O'Leary and the Airport Board, McKeown also requested that O'Leary send him a copy of the current Airport Layout Plan on file with the FAA.

Shortly thereafter, in September 2006, O'Leary informed McKeown[1] through email that he had some "urgency" in talking to McKeown because he had information to convey that "could change [SilverWing's] project layout and parameters [that would] involve land swapping with the County." McKeown responded by sending O'Leary an updated site plan in which the taxiway continued to be located entirely on SilverWing property.

---

[1] While McKeown is referenced throughout this opinion as engaging in the discussions/promises with agents of the County, as of October 25, 2006, SilverWing was formed and the property at issue was transferred to the LLC.

O'Leary then sent McKeown an electronic version of the ALP known as "ALP Alternative 2(B)" ("ALP 2(B)"). In this plan, the County intended that the taxiway be relocated from SilverWing's site plan to a location on Airport property, with all but 7.5 feet of the taxiway on Airport property. In an email accompanying the transmission of ALP 2(B), O'Leary conveyed that the County was "looking to buy 60 feet to the west from [its] property line that is 250 feet from the centerline of the runway. The west-side taxiway will connect with the runway in the south." McKeown testified that he was not sure what O'Leary was referring to when he received the email, but that in "actually put[ting] everything together," he realized that the County was talking about developing a west-side taxiway. That said, McKeown suggested that this information did not concern him at that time because they were in the early development phase of the project and the details were still being worked out.

At about the same time, SilverWing hired Clearwater Engineering (Debbie Van Dyk) to engineer the development, including the west parallel taxiway to connect the property to the Airport runway. Clearwater also hired ES Engineering (Corrie Esvelt-Siegford), an expert engineer relative to airports, to perform additional engineering tasks related to FAA issues. Esvelt-Siegford began her "due diligence" for preliminary engineering by contacting the FAA to verify that the ALP the engineers had received by email was the same ALP the FAA was using. Esvelt-Siegford testified that the FAA assured her that the "runway was not going to move" and they could proceed with their design. The engineers then requested that O'Leary provide them with an FAA approved copy of the ALP for the Airport. Van Dyk went to the Airport office and O'Leary provided her a hard copy of ALP 2(B), stating "this is what you work from." A few days later, O'Leary confirmed,

> [w]e would allow you to build inside our property line so that it aligns and conforms with where the taxiway should go for its future full length. It would conform to FAA specs.

Van Dyk testified that "[i]t would have been a huge red flag" if O'Leary would have told her that she needed to wait for future approval of the ALP from the FAA. Given O'Leary's assurances, SilverWing's engineers relied on ALP 2(B) to site the parallel taxiway and to lay out the development of the SilverWing site, with the taxiway located as set forth on ALP 2(B), almost entirely on Airport property.

4

In December 2006, McKeown met with the Airport Board, the Airport Engineer, and O'Leary. McKeown took SilverWing's final site plan with him to the meeting, which showed that SilverWing had moved the taxiway to its new location consistent with ALP 2(B). McKeown testified that during the meeting the Board and O'Leary assured him that the taxiway, as located on the new site plan, was in the correct place. He added that by "correct," he meant that the taxiway as shown on ALP 2(B) was approved by the FAA, so that SilverWing could go forward with their development.

Shortly thereafter, McKeown took the same site plan to another meeting with Bonner County Commissioner Lewis Rich, along with the Airport Manager and the Airport Board to "confirm exactly what [the County] wanted." McKeown testified that Rich spoke with him at length about the location of the taxiway as depicted on ALP 2(B). Rich expressed no concerns with the location of the taxiway and "actually thanked" McKeown for including the taxiway in SilverWing's development. Rich gave his commitment that placing the taxiway as shown on ALP 2(B) was the way to proceed.

Right after the meeting, McKeown, O'Leary, and the County's Engineer Mark Napier met at the Airport to discuss some Airport equipment that needed to be moved as part of the development. Napier brought a copy of ALP 2(B) and showed McKeown where to move the equipment. The three men then walked the area of the taxiway, and Napier confirmed the location of the taxiway for the project. At no time during the meeting at the Airport did either the County's engineer or its Airport Manager suggest that the taxiway should not be located as depicted on ALP 2(B).

In January 2007, SilverWing formalized its intentions. SilverWing had to submit two forms to the FAA for approval of its development; however, it was instructed to submit such forms to the County through the Airport manager, and the County would forward the forms to the FAA. SilverWing sent the County its plans, which included ALP 2(B) as an attachment, through FAA Form 7480 (Notice of Landing Area Proposal) and FAA Form 7460 (Notice of Proposed Construction and Alteration). SilverWing's engineers, O'Leary and Napier, exchanged emails with comments about the forms, which were incorporated into SilverWing's final submission. The County, as Airport sponsor, submitted SilverWing's plans to the FAA on February 14, 2007. A few days later, the Sandpoint Planning Commission approved SilverWing's PUD and the City of Sandpoint later followed suit. On April 30, 2007, the FAA

5

responded to the County, noting that it had reviewed SilverWing's Form 7480 and said that the FAA had "no objection to its construction, provided that the taxiway design standards meet FAA [requirements as to] Airport Design." Shortly thereafter the FAA approved SilverWing's Form 7460 for construction of its project.

Beginning in September 2007, SilverWing began significant work on the 1,098-foot taxiway, mainly on Airport property consistent with ALP 2(B). SilverWing paid $851,120.00 in construction costs, although this amount was in dispute. Building the taxiway on Airport property led to increased costs for SilverWing because of the heightened requirements for on-Airport construction.

Although SilverWing already had runway access rights under its easement, SilverWing decided to negotiate a Through the Fence Airport Access Agreement ("TTFA"), in part to help share the costs associated with Airport access. The TTFA granted SilverWing, in exchange for a yearly access fee, a perpetual right to access the Airport's runway from its property in private aircraft. The Airport Board adopted the TTFA by unanimous vote and Lewis Rich executed the TTFA on behalf of the County, which included an acknowledgement that SilverWing was constructing 44 residential airplane hangars.

The County also sent the partially executed TTFA to the FAA for review. On May 3, 2007, the FAA responded that it considered residential use adjacent to a public airport an incompatible land use and encouraged the Airport to ensure through the TTFA that access not be provided to hangars with residences. The FAA never approved the TTFA. Even so, one week later the County sent McKeown two copies of the TTFA along with a cover letter stating: "Enclosed are two copies of the revised through-the-fence agreement that the Commissioners signed reflecting the changes made by the Airport Advisory Board. Please return one copy to us. The other copy if [sic] for you to retain for your records." The County did not inform SilverWing that the FAA had not approved the TTFA. On June 6, 2007, SilverWing executed the TTFA as requested and returned one copy to the County.

In December 2008, the FAA placed the Airport in "non-compliance" status because the County had: (1) on May 25, 2000, before SilverWing's ownership, granted an easement without FAA approval; (2) entered into the TTFA with SilverWing allowing "through-the-fence" access to the runway; and (3) allowed numerous private property owners mid-field access to the runway. The non-compliance status was to remain in place for three years, or until the Airport

6

achieved compliance regarding: (1) the County entering into the TTFA with SilverWing without FAA approval and (2) the existence of mid-field runway access points throughout the Airport. To resolve the compliance issues, the County implemented a Corrective Action Plan ("CAP").

The CAP was designed to remedy the FAA's concerns by: (1) pursuing all avenues to extinguish the perpetual nature of SilverWing's TTFA easement; and (2) pursuing an amendment to the SilverWing TTFA to require access only through the end of the runway. The County's plan announced that "midfield access is unacceptable from a safety perspective."

Given the County's position, on March 25, 2009, the FAA notified the County that SilverWing's taxiway had not been constructed based on an "approved ALP." The FAA also stated that if "the taxiway was constructed in the incorrect location, then SilverWing needed to have a plan to relocate the taxiway, when the runway is shifted." McKeown testified that this was the first time he was made aware of the fact that ALP 2(B) had not been approved by the FAA, but SilverWing continued to rely on the County's assurances that the taxiway would not have to be torn out and relocated.

From March 2009 to 2011, SilverWing continued work on the development, while representatives from SilverWing and the County worked with the FAA to bring the Airport back into compliance. In March 2011, an FAA interim policy which allowed existing residential developments with through-the-fence access went into effect. On October 11, 2011, the County approved an amended ALP which would require moving both the runway and taxiway 60 feet to the west, with the County to buy a portion of SilverWing's development. McKeown testified that the amended ALP "ripped up all of my front lots, it ripped up all my taxiways, interior, and it ripped up the taxiway I built on behalf of the County." The amended ALP was approved by the FAA on October 24, 2011. The following December, the County submitted an amended CAP to the FAA which included the approved, amended ALP.

In 2012, Congress enacted the FAA Modernization and Reform Act, which rescinded the previous prohibition on residential through-the-fence access agreements, rendering SilverWing's TTFA compliant with FAA standards. Pub. L. 112-95 § 136, 126 Stat. 23-24 (amending 49 U.S.C. § 47107).

On May 11, 2012, SilverWing initiated this matter by filing a complaint, which contained three claims against the County: (1) breach of covenant of good faith and fair dealing; (2) taking without compensation – inverse condemnation pursuant to 42 U.S.C. section 1983; and (3)

7

violation of equal protection pursuant to 42 U.S.C. section 1983. The case began in Bonner County, but the County removed it to the U.S. District Court for the District of Idaho on June 6, 2012, due to the federal claims. After engaging in discovery, SilverWing amended its complaint to add a fourth claim for promissory estoppel and filed it on October 16, 2013.

The County moved for summary judgment, which the court granted as to SilverWing's first three claims. *SilverWing at Sandpoint, LLC v. Bonner Cnty.*, 2014 WL 6629600, at \*10 (D. Idaho Nov. 21, 2014). The court denied summary judgment on the claim for promissory estoppel. *Id.* On January 21, 2015, the federal court remanded SilverWing's surviving claim to state court, as federal jurisdiction no longer existed.

On May 1, 2015, back in state court, the County moved for judgment on the pleadings and filed a second motion for summary judgment on SilverWing's promissory estoppel claim. On April 13, 2016, the district court denied both motions. On March 3, 2016, the County amended its answer to add counterclaims against SilverWing alleging: (1) breach of contract and (2) breach of the covenant of good faith and fair dealing as to the TTFA. SilverWing moved for summary judgment on all of the County's counterclaims. On September 8, 2016, the court granted the motion as to three of the County's five breach of contract theories and dismissed the claim for breach of the covenant of good faith and fair dealing.

On November 15, 2016, a six-day jury trial began for SilverWing's promissory estoppel claim and the County's remaining breach of contract counterclaim. The jury found in favor of SilverWing on its promissory estoppel claim and awarded $250,000 in damages. The jury denied recovery on the County's counterclaim. On December 15, 2016, the County moved for JNOV on the promissory estoppel claim. The court denied the JNOV motion on March 17, 2017. On April 14, 2017, the County filed this appeal. After briefing, the court awarded SilverWing $704,024.63 for its reasonable attorney fees and $48,883.19 for its costs as a matter of right. The attorney fees were broken up between fees awarded for successful prosecution of SilverWing's promissory estoppel claim and fees awarded for successful defense of the County's counterclaims. The court entered judgment for these costs on June 9, 2017, and on July 13, 2017, the County amended its notice of appeal to include the $486,337.03 the court awarded SilverWing in attorney fees for the promissory estoppel claim.

### III. ISSUES ON APPEAL

1. Whether the district court erred in denying the County's motion for judgment notwithstanding the verdict.
2. Whether the district court erred in awarding SilverWing attorney fees based on the promissory estoppel claim.
3. Whether the County would be entitled to an award of attorney fees in the district court and on appeal, should the underlying judgment be reversed.

## IV. STANDARD OF REVIEW

### A. Judgment Notwithstanding the Verdict

This Court reviews the denial of a JNOV with the same standard that the district court applied when it originally ruled on the motion. *Olson v. EG&G Idaho, Inc.*, 134 Idaho 778, 781, 9 P.3d 1244, 1247 (2000). When based on I.R.C.P. 50(b), a motion for JNOV is treated as a delayed motion for a directed verdict and the standard for both is the same. *Quick v. Crane*, 111 Idaho 759, 763, 727 P.2d 1187, 1191 (1986). "In making the motion, the defendants necessarily admit[] the truth of all of the plaintiffs' evidence and every legitimate inference that could be drawn therefrom in the light most favorable to the plaintiff." *Id*. The determination of whether the evidence is sufficient to create an issue of fact is purely a question of law. *Id*. "The question is not whether there is literally no evidence supporting the party against whom the motion is made, but whether there is substantial evidence on which the jury could properly find a verdict for that party." *Id*. Substantial evidence does not require that the evidence be uncontradicted. *Highland Enters., Inc., v. Barker*, 133 Idaho 330, 337, 986 P.2d 996, 1003 (1999). Rather, the evidence need only be of sufficient quantity and probative value that reasonable minds could conclude that the verdict of the jury was proper. *Id*.

Thus, the Court cannot weigh the evidence, assess the credibility of witnesses, or make its own factual findings and compare them to those of the jury. This Court must review the record of the trial and draw all inferences in a light most favorable to the non-moving party. *Id*. A JNOV should be granted only if "there can be but one conclusion as to the verdict that reasonable minds could have reached" and that conclusion does not conform to the jury verdict. *Id*. (internal quotations and citations omitted). "The function of a JNOV is to give the trial court the last opportunity to order the judgment that *the law requires*." *Highland Enters.*, 133 Idaho at 337, 986 P.2d at 1003 (citing *Quick* 111 Idaho at 764, 727 P.2d at 1192) (emphasis added).

### B. Attorney Fees

The awarding of attorney fees and costs is within the discretion of the district court and is subject to the abuse of discretion standard of review. *Idaho Transp. Dep't v. Ascorp, Inc.*, 159

9

Idaho 138, 140, 357 P.3d 863, 865 (2015). When this Court considers whether the district court abused its discretion, it applies a four-part test: (1) whether the court correctly perceived the issue as discretionary; (2) whether the court acted within the outer boundaries of its discretion; (3) whether the court acted consistently with the legal standards applicable to the specific choices available to it; and (4) whether the district court reached its decision by an exercise of reason. *Lunneborg v. My Fun Life,* 163 Idaho 856, 863, 421 P.3d 187, 194 (2018). Whether an action is based on a commercial transaction is a question of law, which we review under the standard of free review. *Intermountain Real Properties, LLC v. Draw, LLC*, 155 Idaho 313, 320, 311 P.3d 734, 741 (2013).

## V. ANALYSIS

### A.  The district court erred in denying the County's motion for judgment notwithstanding the verdict on the claim of promissory estoppel.

The County argues that the district court erred in failing to grant its motion for JNOV on nine separate grounds; however, the dispositive issue for this appeal is whether the evidence before the jury showed that SilverWing suffered a substantial economic detriment due to its reliance on the County's promises. Since this issue resolves this appeal, we do not reach the remaining issues, other than as to attorney fees.

A cause of action for promissory estoppel requires a plaintiff to prove

> (1) reliance upon a specific promise; (2) substantial economic loss to the promisee as a result of such reliance; (3) the loss to the promisee was or should have been foreseeable by the promisor; and (4) the promisee's reliance on the promise must have been reasonable.

*Zollinger v. Carrol*, 137 Idaho 397, 399, 49 P.3d 402, 404 (2002).[2] Speaking more broadly, this Court has generally described the doctrine of promissory estoppel as meaning that

> "[a] promise which the promisor should reasonably expect to induce action or forebearance on the part of the promisee or a third person and which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise."

---

[2] The district court points out that promissory estoppel claims in Idaho have some variation with the elements. The jury was instructed that SilverWing had the burden of proving: (1) The County made a promise or promises to SilverWing; (2) SilverWing relied on the promise or promises by acting, or not acting, to its detriment; (3) SilverWing's reliance on the promise was, or should have been, foreseeable to the County; (4) SilverWing's reliance on the promise was reasonable; and (5) SilverWing suffered substantial economic loss as a result. Although this instruction varies from a direct quote of our cases, we do not find it improper.

*Smith v. Boise Kenworth Sales, Inc.,* 102 Idaho 63, 67–68, 625 P.2d 417, 421–22 (1981) (quoting Restatement (Second) of Contracts § 90(1) (1973)).

In this case we construe disputed factual evidence in the record in favor of SilverWing as the prevailing party. While the County's appeal raises a number of important questions, they are better left for another day. Even if all of the promissory estoppel issues are resolved in SilverWing's favor, the jury's award of $250,000 in reliance damages cannot be sustained as a matter of law. The dearth of evidence of SilverWing's "substantial economic detriment" is such that we hold there is no substantial evidence to support the jury's verdict. Thus, "the judgment that the law requires," *Highland Enters.*, 133 Idaho at 337, 986 P.2d at 1003, is one in favor of the County. The district court should have granted the County's motion for judgment notwithstanding the verdict.

The record establishes that SilverWing bought 18.1 acres, intending to develop its property for hangar residences next to the airport. McKeown testified that SilverWing first planned to build the taxiway entirely on SilverWing's property, but that based on the County's representations about ALP 2(B), they moved the taxiway so that it was built partially on airport property. This move cost SilverWing additional sums that would not have been required if the taxiway had been built solely on SilverWing's property. The taxiway was built in 2007. Once the taxiway was constructed, SilverWing learned in 2008 that ALP 2(B) had not been approved by the FAA. In 2009, the County reversed its long-held position and demanded that SilverWing remove the taxiway because ALP 2(B) was unapproved and the airport had been placed in noncompliance status by the FAA.

The County's demand led to years of negotiations among the County, SilverWing and the FAA. Ultimately SilverWing filed this lawsuit in 2012, although its claim for promissory estoppel was not added until 2013. While the litigation was pending, the federal government changed positions, including an act of Congress that ameliorated the FAA's objections with the taxiway's location. Thus, SilverWing's runway remains where it was built in 2007, with no probable expectation that it will ever have to be moved.

SilverWing's counsel argued to the jury that this was a case "about broken promises," based on SilverWing's reliance on ALP 2(B). Yet even though it took eight years and an act of Congress, SilverWing actually got what it claims the County promised—an FAA approved

11

taxiway in the location where SilverWing built it. SilverWing can now sell its development with no regulatory uncertainty.

To understand the problem with the jury's award, it is important to look at the damages theories and evidence that SilverWing presented to the jury. The district court instructed the jury that SilverWing had the burden of proving that it suffered "substantial economic loss" as a result of the County's promise. SilverWing built its damages case largely around the testimony of two experts—a real estate appraiser and a forensic economist. The forensic economist testified that he was tasked with evaluating two things: (1) the damages sustained by SilverWing as a result of the eight-year delay in the planned selling of the units (the "expectancy" damages); and (2) out-of-pocket expenses incurred by SilverWing as of December 31, 2008, the date it learned that the taxiway it built on County property was not in compliance with the FAA's requirements, as ALP 2(B) had never been approved (the "reliance" damages). McKeown also testified about the monies SilverWing expended to build the taxiway as they did, but his financial testimony largely mirrored or buttressed the expert testimony.

To determine the "expectancy" damages caused by the delay, the economist explained to the jury that he developed a model for projected sales based on assumptions provided by the real estate appraiser as the project was originally planned and a model for projected sales based on the delay caused by regulatory uncertainty. When he compared the two models, the economist testified that he calculated that the eight-year regulatory delay cost SilverWing over $11,000,000 in damages.

To determine the "reliance" damages, the economist testified that he reviewed verifiable out-of-pocket expenses that SilverWing incurred from the time the County made its promises until the time SilverWing learned the taxiway location was not approved. The economist testified that the total reliance damages were $5,723,120.00. The economist presented the jury two charts setting forth both the expectation and the reliance damages.

The County moved in limine prior to trial seeking to exclude the testimony of SilverWing's damages experts. There was a battle over what damages could be recovered in a promissory estoppel case—reliance vs. expectancy—and there was a battle over whether there was enough evidence to support the experts' opinions[3]. The district court denied the motion in

---

[3] Such a battle is unsurprising, as legal commentators also dispute how damages should be calculated in promissory estoppel cases. The argument centers on whether damages should be premised on expectation damages or reliance

12

limine at the time it was made, ruling that it would decide whether there was adequate foundation for the experts' opinions after hearing the evidence at trial.

After all of the evidence was presented, the district court granted the County's motion in limine in part by eliminating SilverWing's claim for the expectancy (delay) damages. The district court found that the claim was too speculative, so the claim was not presented to the jury on the special verdict form. The district court rejected the claim for expectancy damages as a matter of law.

The district court did, however, allow the jury to consider SilverWing's claim for "reliance" damages. The jury was asked the following question: "What is the amount of out-of-pocket damages, if any, sustained by SilverWing as a result of its reliance on Bonner County's promise or promises from October 25, 2006 through December 31, 2008?" The jury answered: "$250,000." SilverWing's request for reliance damages and the district court's subsequent allowance of them was legally flawed.

In its brief to this Court, SilverWing defends the jury's award by arguing that it had to incur increased costs to design and build its taxiway on the County's property since it had to comply with FAA guidelines. McKeown's testimony bears out SilverWing's position, but those increased costs are not "reliance" damages. Section 344 of the Restatement (Second) of Contracts explains the difference in purpose behind "expectancy" damages and "reliance" damages:

> Judicial remedies under the rules stated in this Restatement serve to protect one or more of the following interests of a promise:
>
> > (a) his "expectation interest," which is his interest in having the benefit of his bargain *by being put in as good a position as he would have been in had the contract been performed*,
> >
> > (b) his "reliance interest," which is his interest in being reimbursed for loss caused by reliance on the contract by *being in as good a position as he would have been in had the contract not been made*, or
> >
> > (c) his "restitution interest," which is his interest in having restored to him any benefit that he has conferred on the other party.

damages. *See* Mary E. Becker, *Promissory Estoppel Damages*, 16 Hofstra L. Rev. 131, 131–132 (1987); Orit Gan, *Promissory Estoppel: A Call for a More Inclusive Contract Law*, 16 J. Gender Race & Just. 47, 60 (2013); *see also* 24 Williston on Contracts § 64:4 (4th ed. 2018). We offer no opinion on that question and leave the matter for another day.

Restatement (Second) of Contracts § 344 (1981) (emphasis added); *see also* Restatement (Second) of Contracts § 349 (1981) ("As an alternative to the measure of damages [in general], the injured party has a right to damages based on his reliance interest . . . less any loss that the party in breach can prove with reasonable certainty the injured party would have suffered *had the contract been performed*.") (Emphasis added).

This Restatement provision makes it clear that reliance damages are intended to put SilverWing in as good as a position as it would have been in had the County not made the alleged promises. In other words, an award of reliance damages "returns the plaintiff to its precontractual position by putting a dollar value on the detriment the plaintiff incurred in reliance on the now-broken promise." 24 WILLISTON ON CONTRACTS § 64:4 (4th ed. 2018). Yet SilverWing was never in any position other than the position to which it was directed by the County under ALP 2(B). It never "developed" the taxiway on its property, going to increased expense to move it as the County directed. SilverWing may have hoped to keep it on its own property to save costs, but that hope does not amount to reliance damages for building the taxiway in compliance with what the FAA requires.

By the time of trial, the County fully performed the promises that SilverWing alleges were made; those promises were never broken. There is no doubt that there was a substantial delay, but any damages caused by that delay are expectancy damages. SilverWing's forensic economist presented his expectancy damages models and they were rejected by the district court as a matter of law. No other expectancy measure was presented, and SilverWing has not appealed the district court's decision to preclude those damages.

SilverWing argues that the district court rejected this reliance damages analysis when it considered the County's motion for judgment notwithstanding the verdict. The district court wrote:

> Defendant contends that "the funds [Plaintiff] expended to design and build its taxiway or model hanger home unit cannot fairly be construed as damages because nothing has changed and [Plaintiff's] development as it stands today is in conformity with the [Airport Layout Plan]." However, the question is not whether the facts support a theory that, if the jury relied on, would render a verdict improper, but instead, the question is whether the evidence is of "such sufficient quantity and probative value that reasonable minds could conclude that the verdict of the jury was proper," even if the evidence is contradicted. For it is not only the FAA's approval or disapproval, of Plaintiff's development that bears on Plaintiff's economic loss, but also the money spent that it would not have spent

14

but for Defendant's promises. "[The Idaho Supreme Court] will not second guess the jury's determinations as to the weight of the evidence and witness credibility." *Mackay v. Four Rivers Packing Co.*, 151 Idaho 388, 391, 257 P.3d 755, 758 (2011). Neither will this Court.

We recognize and support the bedrock principle that this Court will not second guess jury determinations over the weight of the evidence or witness credibility. The issue here, however, is not a factual inquiry into additional costs for the taxiway because of its location or a dispute over witness credibility. The issue is a legal one—whether that expense is recoverable at all where the County's alleged promises have now been fulfilled. As such, we hold that the district court erred in denying the County's motion for judgment notwithstanding the verdict. The judgment is vacated and the case remanded for a redetermination of costs and fees as set forth below.

**B.      Neither party is entitled to attorney fees in this case.**

Having vacated the judgment here, the costs and attorney fees awarded to SilverWing are likewise vacated.

*1.   The district court correctly held that the TTFA did not encompass the County's promises to SilverWing; therefore the TTFA cannot form the basis for attorney fees on appeal or below.*

The County recognizes that the jury found it made sufficient promises to SilverWing to support SilverWing's claims. Nonetheless, it contends that such promises were subsumed by the TTFA in this case, and that as such, the doctrine of promissory estoppel does not apply. While we have resolved the promissory estoppel question based on damages, we provide the following analysis relative to the TTFA since the County relies upon the TTFA for an award of attorney fees here.

SilverWing contends that the TTFA was simply an agreement to guarantee access between SilverWing's hangar residences and the mid-field area of the Airport runway. SilverWing obtained an easement with right of access when the 18.1 acres were purchased for the development; the TTFA merely fortified SilverWing's position that those purchasing hangar residences were guaranteed access to the Airport. The County's directives about where to locate the taxiway had nothing to do with granting airport access "through-the-fence." Thus, the County's promises to SilverWing about where to build its taxiway are independent of and separate from the TTFA. SilverWing also argues that the TTFA's inclusion of a map of the

15

Airport does not establish that the Airport layout was within the scope of the agreement, but that the map simply identified the overall scope of the project and the airport's location. The Court agrees with SilverWing.

The narrow question here is whether the language of the TTFA is as all-encompassing as the County argues. If the TTFA covers the location of the taxiway, SilverWing would have no claim for promissory estoppel. This is because promissory estoppel serves as a substitute for consideration in those circumstances when the parties have a binding agreement, which otherwise would be unenforceable because of lack of consideration. *Nicholson v. Coeur d'Alene Placer Mining Corp.*, 161 Idaho 877, 882, 392 P.3d 1218, 1223 (2017); *Lettunich v. Key Bank Nat'l Ass'n*, 141 Idaho 362, 367, 109 P.3d 1104, 1109 (2005); *Gillespie v. Mountain Park Estates, L.L.C.*, 138 Idaho 27, 30, 56 P.3d 1277, 1280 (2002). If a written agreement covers the subject matter of a claim based on promissory estoppel, consideration for the agreement is presumed and promissory estoppel cannot apply. *Gillespie*, 138 Idaho at 30, 56 P.3d at 1280; *see also Profits Plus Capital Mgmt., LLC v. Podesta*, 156 Idaho 873, 891, 332 P.3d 785, 803 (2014).

> "When interpreting a contract, this Court begins with the document's language. In the absence of ambiguity, the document must be construed in its plain, ordinary and proper sense, according to the meaning derived from the plain wording of the instrument."

*Phillips v. Gomez*, 162 Idaho 803, 807, 405 P.3d 588, 592 (2017) (quoting *Potlatch Educ. Ass'n v. Potlatch School Dist. No. 285*, 148 Idaho 630, 633, 226 P.3d 1277, 1280 (2010)).

The plain reading of the TTFA establishes that it is not an agreement about where to place a taxiway; indeed, the County's promises to that effect are not referenced by or associated with the document in any way. It is also noteworthy that the County made promises to SilverWing in late 2006 and 2007, *before* the execution of the TTFA in June 2007. Additionally, the meetings, emails, and interactions between McKeown and the County about placement of the taxiway occurred well before the TTFA was executed. Thus, these facts provide substantial evidence that the taxiway promises were independent of the TTFA.

Perhaps anticipating this ruling from the Court, the County then argues that these promises were subsumed by the TTFA when it was executed. The TTFA includes a "no oral modifications" clause which states "[t]his agreement shall not be modified by either party by oral representation made before or after the execution of this Agreement . . . ." This argument is also not supportable. The TTFA was independent of the promises made about the location of the

taxiway and SilverWing's right to rely on ALP 2(B) as part of its development. As the district court recognized:

> Other than the physical proximity to one another, mid-field access rights (arising under contract between the parties) and the airport configuration (the duty solely of [the County] to manage) are too factually disconnected for the legal benefit of both to derive from the bargain for one. Contracting access rights with a developer does not cure inaccurate assertions and promises unrelated to the terms of that contract. . . .Where the airport layout plan called for [SilverWing's] development (be it adjacent to, or very far away from, the runway) is independent from whether planes coming from such development had permission to access the airport runway, and if so, at what cost. . . . Because there are no terms in the TTFA specifically indicating the parties were bound to follow a particular layout plan, the promises made about layout plans were unrelated.

For the TTFA's no oral modifications clause to apply to the County's representations about the location of the taxiway, those representations must have been part of the TTFA itself. They simply were not part of the agreement and constituted an independent promise made to SilverWing, as the jury found.

Thus, we conclude as a matter of law that the TTFA cannot serve as the basis for an award of attorney fees or costs against SilverWing here. This litigation was not based on, nor did it materially involve the TTFA as the basis for SilverWing's claims. Thus, the TTFA is not a means to award attorney fees to the County in this case.

2. *The district court erred in holding that Idaho Code section 12-120(3) applies to SilverWing's promissory estoppel claim.*

Idaho law provides by court rule that "[i]n any civil action the court may award reasonable attorney fees . . . to the prevailing party . . . as defined in Rule 54(d)(1)(B), when provided for by any statute or contract." I.R.C.P. 54(e)(1). The basis for the district court's award of attorney fees to SilverWing was statutory, as provided in Idaho Code section 12-120(3). Section 12-120(3) provides that in any civil action involving a "commercial transaction . . . the prevailing party shall be allowed a reasonable attorney's fee to be set by the court, to be taxed and collected as costs." I.C. 12-120(3).

The County appeals the $486,337.03 award of attorney fees to SilverWing asserting that its promissory estoppel claim was not based on a commercial transaction and so the fee award was erroneous. SilverWing counters that it relied on the County's promises in developing its

17

project and those promises were made in the hope that the development and taxiway would increase tax revenue and jobs for the County. We agree with the County.

To resolve this issue, we must again review the statutory meaning of a "commercial transaction." "[W]hether a party can recover attorney fees under Idaho Code section 12-120(3) depends on whether the gravamen of a claim is a commercial transaction." *Stevens v. Eyer*, 161 Idaho 407, 410, 387 P.3d 75, 78 (2016). "A gravamen is 'the material or significant part of a grievance or complaint.'" *Id.* (quoting *Merriam Webster's Collegiate Dictionary* 509 (10th ed.1993)). "[C]ourts analyze the gravamen claim by claim." *Id.* (citation omitted). "To determine whether the significant part of a claim is a commercial transaction, the court must analyze whether a commercial transaction (1) is integral to the claim and (2) constitutes the basis of the party's theory of recovery on that claim." *Id.* (citation omitted).

The question thus presented is whether the gravamen of the promissory estoppel claim here is a commercial transaction. This requires two points of analysis: 1) was the relationship between SilverWing and the County a "commercial" one; and 2) did the promises made by the County form a "transaction"? We hold that while the relationship was a commercial one, there was no *transaction* between the County and SilverWing regarding placement of the west taxiway.

"Promissory estoppel is an extension of the basic contract principle that one who makes promises must be required to keep them." *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1257 (10th Cir. 2016) (citation omitted). Promissory estoppel "is another name for an implied-in-law contract claim." *XP Vehicles, Inc. v. United States*, 121 Fed. Cl. 770, 782 (2015) (citation omitted). A contract implied in law is a fiction of law, "essentially an equitable cause of action whereby one who reasonably relies on another's promise can subsequently require [him] to make good on his promise." *Id.* (citations and internal quotations omitted).

As noted, the County's promise to SilverWing involved placement of the taxiway. That promise is by its very nature "commercial." As the district court noted,

> [t]he parties entered the transaction for a commercial purpose. [SilverWing] relied on [the County's] promises in developing its commercial hangar-home project, tacitly to facilitate its completion. [The County] made the promise to [SilverWing] for a commercial purpose; [the County's] commercial purpose was the pecuniary benefits of increased tax revenue, approximately $750,000 a year.

18

Even though there was a "commercial purpose" to the relationship between the County and SilverWing, we deviate from the district court's conclusion that the promises made and relied on establish a "transaction." Black's Law Dictionary defines a transaction as "[t]he act or an instance of conducting business or other dealings; esp., the formation, performance, or discharge of a contract . . . . [or] a business agreement or exchange." *Transaction*, BLACK'S LAW DICTIONARY (10th ed. 2014). Merriam Webster defines a transaction as "an exchange or transfer of goods, services, or funds." *Transaction*, MERRIAM-WEBSTER'S COLLEGIATE DICTIONARY, (11th ed. 1994).

A claim based on promissory estoppel is "essentially an equitable cause of action . . . ." *XP Vehicles*, 121 Fed. Cl. at 782. As noted above, we have held that promissory estoppel serves as a substitute for the consideration for a contract. *See*, *e.g.*, *Nicholson v. Coeur d'Alene Placer Mining Corp.*, 161 Idaho at 882, 392 P.3d at 1223. Thus, construing SilverWing's equitable claim as a *transaction* would be logically inconsistent with the reasoning that it serves as a substitute for consideration. In other words, SilverWing's equitable claim, substituting for consideration, does not amount to a *transaction* as that term is expressed in Idaho Code section 12-120(3).

The cases cited by both parties to support their positions are misdirected, because those cases either did not involve a commercial relationship between the parties, *e.g. Brower v. E.I. Dupont de Nemours & Co.*, 117 Idaho 780, 792 P.2d 345 (1990) (attorney fee award reversed where a *commercial* transaction did not occur), or there was clearly a commercial *transaction* at issue in the case. *Cf. Bryan Trucking, Inc. v. Gier*, 160 Idaho 422, 374 P.3d 585 (2016) (claims of fraud and breach of contract in the sale of a truck; the sale of the truck was a commercial transaction). Here, even though the parties had a commercial relationship, they never consummated a commercial *transaction* for purposes of Idaho Code section 12-120(3).

Thus, we hold that the gravamen of SilverWing's promissory estoppel claim was not an action to recover in a commercial *transaction* and that attorney fees were improperly awarded. Thus, neither party is entitled to attorney fees at the district court or on appeal in this case.

3. *The County is not entitled to an award of its attorney fees in this case under Idaho Code section 12-117.*

Idaho Code section 12-117 provides that a party that prevails on appeal is entitled to "reasonable attorney's fees, witness fees and other reasonable expenses, if [this Court] finds that

the nonprevailing party acted without a reasonable basis in fact or law." While the County has prevailed in this appeal, SilverWing's claims were supported by reasonable arguments. As such, the County is not entitled to attorney fees under this statute.

## VI. CONCLUSION

For the reasons set forth above, the district court's ruling on the County's motion for judgment notwithstanding the verdict is reversed and the judgment in favor of SilverWing is vacated. The district court's judgment awarding attorney fees to SilverWing as to the promissory estoppel claim is also vacated for the reasons set forth herein. Costs on appeal are awarded to the County. No attorney fees are awarded to either party.

Chief Justice BURDICK, Justices BRODY, STEGNER and HORTON, CONCUR.